**MUNICIPALITY OF ANCHORAGE,**
Appellant,

v.

John M. GENTILE; Greg Bauer; Jerry Fries; Margaret Borrecco; Donavon Langdok; and William Smith, Appellees.

John M. GENTILE; Greg Bauer; Jerry Fries; Margaret Borrecco; Donavon Langdok; and William Smith, Appellants,

v.

**MUNICIPALITY OF ANCHORAGE,**
Appellee.

Nos. S–5965, S–6305.

Supreme Court of Alaska.

Aug. 16, 1996.

---

249

Mark A. Casciari, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, George M. Newsham, Assistant Municipal Attorney, Richard L. McVeigh, Municipal Attorney, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellant.

Peter J. Maassen, Ingaldson Maassen, P.C., Anchorage, and Peter Gruenstein, Gruenstein, Hickey & Stewart, Anchorage, for Appellees.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

After the Municipality of Anchorage (MOA) reduced the post-retirement medical benefits of its retired police officers and firefighters, John Gentile and five other retirees, representing 154 affected retirees, filed a class action to restore benefits and prevent future decreases. The superior court permanently enjoined the reductions, held that MOA did not breach the covenant of good faith and fair dealing, and awarded the retirees substantial attorney's fees against MOA. These appeals followed. We remand for reconsideration of attorney's fees. We otherwise affirm.

### II. FACTS AND PROCEEDINGS

#### A. Background

MOA reduced the post-retirement medical benefits of its retired police officers and firefighters in 1992, substantially increasing their deductibles and copayments.

#### B. The Collective Bargaining Agreements

Although the retired firefighters and police officers comprise the plaintiffs' class, the claims of these two groups of retirees are based on two separate series of collective bargaining agreements (CBAs). The police officer retirees' contract claims are based on CBAs between MOA and the Anchorage Police Department Employees Association (APDEA); the firefighter retirees' contract claims are based on a series of CBAs between MOA and the International Association of Firefighters (IAFF). The historical context, established by trial court evidence, of contract negotiations is important.

In the 1970s the Teamsters Union, representing Anchorage police officers, negotiated contracts providing substantial post-retirement medical coverage. Although union police officers had an excellent retirement plan, unrepresented command officers had less-favorable coverage. This created a problem for MOA in that veteran officers did not wish

to be promoted because they would lose their more-favorable retirement benefits.

In 1977, the Anchorage Municipal Assembly approved Anchorage Code Ordinance (ACO) 77–257 (1977). The ordinance provided medical benefits to the command officers under the "medical insurance program of the Municipality" at the Municipality's expense. At a MOA Assembly meeting, Police Chief Anderson stated that ACO 77–257 would help close the gap that existed between represented and non-represented public safety officers. The superior court found that "[i]n adopting AO 77–257, both Mayor Sullivan and the Assembly understood the open-ended nature of the cost and commitment MOA was undertaking to the non-represented public safety employees with respect to their post-retirement medical benefits."

The APDEA and IAFF CBAs at issue here were negotiated about three years after ACO 77–257 was approved. The post-retirement medical benefits provision of the pertinent APDEA CBAs contain the following language:

1. The APDEA disaffiliated from the Teamsters and directly negotiated the July 1980 to October 1982 contract with MOA. Entering these negotiations, MOA's goal was an agreement for post-retirement medical benefits less extensive than those of the Teamsters and more closely aligned with MOA's Public Employees Retirement System (PERS).

 Bill Smith (a different person than plaintiff William Smith) became MOA's labor negotiator in November 1980. During negotiations with Fred Dichter, APDEA's labor negotiator, MOA proposed the following provision:

 > Amend the existing agreement (Article XIX) to provide that, effective January 1, 1981, the Municipality shall provide medical coverage for all retirees from the Anchorage Police Department. Major medical coverage including coverage for audio and visual, but excluding dental coverage, will be provided.

 In response, APDEA proposed the following change to the last sentence:

 > Major medical coverage including coverage for audio, visual and dental will be provided. *This provision will remain in effect in this and all subsequent agreements. Coverage under this provision may not be diminished.*

 (Emphasis added.) MOA rejected this language because it would have locked in the level of medical benefits in perpetuity. The language contained in the July 1980 CBA was the parties' compromise.

Effective January 1, 1981, the Municipality shall provide medical coverage for all retirees from the Anchorage Police Department who are not provided such coverage by another plan. Major medical coverage including coverage for audio and visual will be provided. The retiree will have the option to purchase dental coverage at his own expense. Coverage under this provision may not be diminished during the term of this agreement.

This language was first adopted in the CBA governing July 1980 to October 1982.[1] All subsequent CBAs between the APDEA and MOA contained this language.[2]

Every IAFF CBA since January 1, 1981, has contained the following post-retirement medical benefits provision:

> 16.2 Members of the Union who retired after January 1, 1978 may participate in the post retirement medical benefits plan at the cost of the employer. Eligible retired members may elect to participate in the audio, vision or dental coverages of the plan. Such coverage, if elected, shall be at the expense of the retired member.[3]

2. The APDEA received dental coverage beginning with its 1982 CBA.

3. The history of the IAFF agreements differs slightly from that of the APDEA agreements, although MOA attempted to keep the firefighters' retirement medical benefits nearly identical to those given the police officers. A December 12, 1977 agreement provided the first post-retirement medical benefits given to IAFF members. *This agreement was "Administrative Letter # 2,"* an amendment to an existing agreement. It stated:

 > Those employees who retire after January 1, 1978 may participate in the reduced level post retirement medical benefits plan costing $63.61 which they will pay to the Municipality. The rate is guaranteed for the 1978 benefit year.

 In March 1980, the parties agreed to change the contract to require MOA to pay for the medical coverage. "Benefits under the plan are the same as those provided under Administrative Letter # 2 dated December 12, 1977, and will not be diminished during the term of this agreement, except by mutual agreement." The IAFF CBA effective January 1981 adopted the post-retirement medical benefits provision contained in every subsequent IAFF CBA.

The trial court found that MOA intended to provide a level of medical retirement coverage to represented IAFF employees similar to that provided command officers under ACO 77–257. John Franklin, who at different times had been Deputy Fire Chief, Fire Chief, Commissioner of Public Safety, and City Manager for Mayors George Sullivan and Tony Knowles, was involved in the negotiations with IAFF. He understood throughout the negotiations that the level of post-retirement medical benefits could not be diminished for current retirees. He widely communicated that belief to firefighters and other MOA employees.

### C. *Conduct under the CBAs*

Several retired police officers and firefighters testified that they believed their benefits could not be reduced from their 1980 levels. They stated that shortly before retirement one or more MOA employees unequivocally informed them that the retirees' post-retirement medical benefits would not be subject to reduction. The superior court found those police and fire employees to be more credible than those witnesses who offered conflicting testimony.

The retirees' beliefs were also supported by letters MOA sent to retirees stating that they were entitled to health insurance, and by benefits booklets MOA sent retirees between 1978 and 1992. MOA did not dispel the retirees' belief that retiree medical benefits would not decrease.

In 1986 the MOA legal department considered whether MOA could unilaterally terminate the medical benefits of retirees. It concluded that the contracts and documents given to retirees "may create . . . a vested right." The legal department advised MOA that if it wished to decrease post-retirement medical benefits it should immediately change the language of the agreements and documents given to the retirees and instruct its management not to make "lifetime" representations regarding post-retirement medical benefits. MOA did not follow any of these recommendations.

In 1991, while Tom Fink was mayor, the MOA Assembly created an advisory committee (Committee) to study the issue of unfunded liabilities created by the retiree medical benefits of MOA police and firefighters. The Committee prepared an interim and a final report. Both reports concluded that there was "substantial risk of liability" if MOA reduced medical coverage for retirees. The interim report recommended that "coverage continue to be provided as in the past," and the final report recommended implementation of "reasonable cost containment measures" (such as a preferred provider plan). However, the final report noted that with the present retirees, "it appears the Municipality must act so that actions are not determined to be a diminishment of retiree benefits." The final report recommended that "the Assembly and Administration never again enter into a blank check unlimited contract or accept the existence of an unfunded liability."

The Committee's conclusions were consistent with the legal opinion of Corbett & Kane, a California law firm hired to present independent legal advice to the Committee. Corbett & Kane reviewed the CBAs, municipal ordinances, MOA letters sent to retirees, the health benefits booklets and policies, and other documents concerning retiree medical benefits prepared by MOA's Employee Relations Department. In its written report to the Committee, the law firm concluded that "[t]here is a substantial risk of liability if medical benefits for bargaining unit Retirees or Deferred Vesteds are eliminated or reduced or if a charge for them is imposed." It also informed the Committee that a unilateral decrease would be the riskiest option to reduce the liability.

MOA's administration and Assembly received the Committee's reports. Mayor Fink read, and disagreed with, the Committee's reports and the Corbett & Kane analysis. He is a law school graduate and is knowledgeable about insurance. He testified at trial that he had read articles in the *Wall Street Journal* that indicated that there were "multiple cases across the country challenging post retirement benefits in the public sector as well as the private sector." He also testified that before deciding to decrease the benefits, he asked the Municipal Attorney, Richard McVeigh, whether such a move would be legal. McVeigh recalled telling the

Mayor that there did not appear to be anything in the contract language that would require the benefits to continue. However, McVeigh acknowledged that he did not research the issue because the issue was being handled by the Committee.

Mayor Fink decided to reduce the benefits. He wanted the unfunded liability issue to be resolved through litigation, believing that the risk was minor compared to the cost MOA would incur if no action were taken. In 1992 Mayor Fink reduced post-retirement medical benefits to the same level as medical benefits for active public safety employees.

### D. Legal Proceedings

The Gentile plaintiffs, acting as representatives of retirees affected by the reductions, filed their class action suit against MOA in October 1992. The retirees ultimately claimed breach of contract, bad faith breach of contract, violation of the Alaska Constitution, breach of fiduciary duties, estoppel, and breach of the covenant of good faith and fair dealing.

After a bench trial on the breach of contract and constitutional claims, the trial court granted a permanent injunction that prevented MOA from reducing the medical benefits. The court found that the parties intended to establish vested post-retirement medical benefits. It also held that the Alaska Constitution prevented MOA from diminishing the retirees' medical benefits. It entered final judgment against MOA on September 3, 1993.

After a separate three-day trial, the trial court held that the attempted benefit reduction did not violate the covenant of good faith and fair dealing. It entered a separate judg-

ment on March 14, 1994 against the retirees on that claim.

Counsel for the class moved for an attorney's fees award. They sought "an amount that acknowledged the value of the benefit that the litigation preserved to the class, took into account the case's contingent risks, and advanced the public policies of [Alaska Civil] Rule 23." The trial court found the retirees to be the prevailing parties and awarded them $342,531 in attorney's fees against MOA. It held that under Civil Rule 82 it was unable to include any risk-enhancement in the award.

MOA appeals from the September 3, 1993 judgment, arguing the trial court (1) erred in holding that the CBAs intended to vest post-retirement medical benefits at retirement; (2) erred in holding that the medical benefits were "vested" under article XII, section 7 of the Alaska Constitution; and (3) usurped the Assembly's legislative authority.[4]

The retirees appeal from the March 14, 1994 judgment and the order awarding attorney's fees, asserting the trial court erred in holding that MOA did not violate the covenant of good faith and fair dealing and in failing to award enhanced attorney's fees.

### III. DISCUSSION

#### A. Intention to Vest Post–Retirement Medical Benefits at Retirement

■■■ We must decide whether MOA and the APDEA and IAFF intended the CBAs to vest post-retirement medical benefits at retirement. As both parties recognize, this is fundamentally a question of contract. The goal of the court is to enforce the reasonable expectations of the parties. Stepanov v. Ho-

---

4. MOA also argues that the trial court erred in awarding full "actual" attorney's fees to the retirees. MOA asserts in its appellee's brief in S–6305, the appeal commenced by the Gentile parties, that it has cross-appealed from the award of attorney's fees. However, our files contain no such cross-appeal. MOA filed a motion to supplement its appellate points with the attorney's fees issue in S–5965, the appeal in which MOA was the appellant, but MOA did not file that motion until after briefing in that appeal was already complete. (Argument in S–5965 preceded argument in S–6305 by four months.) These two appeals were briefed and argued separately.

We have issued a single opinion because the two appeals share a common legal origin and factual foundation, even though they arise out of separate judgments.

We denied MOA's motion to supplement its points on appeal in S–5965, but our order stated that *"upon receipt of the documents required by AR 204(b),* the issues Appellant [MOA] raised in the supplemental points on appeal will be treated as a cross-appeal in S–6305." (Emphasis added.) MOA did not file the documents required by that order and consequently failed to perfect and preserve its would-be cross-appeal. *See also infra* note 26.

mer Elec. Ass'n, Inc., 814 P.2d 731, 734 (Alaska 1991). In determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made. *Fairbanks N. Star Borough v. Tundra Tours,* 719 P.2d 1020, 1024 (Alaska 1986). The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.[5] *Id.* (citing *Peterson v. Wirum,* 625 P.2d 866, 870, 872 nn. 7 & 10 (Alaska 1981), and *Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983)).

The interpretation of words in a contract, where the extrinsic evidence is undisputed, is generally a task for the trial court whose decision is reviewed *de novo. Oaksmith v. Brusich,* 774 P.2d 191, 195 (Alaska 1989); *Norton v. Herron,* 677 P.2d 877, 880 (Alaska 1984). However, where the trial court relies on conflicting extrinsic evidence, as in this case, we are "confined to determining whether the facts support the trial court's interpretation." *Tundra Tours,* 719 P.2d at 1025. We review the trial court's findings under the clearly erroneous standard. *Id.* A clearly erroneous finding is one which leaves the court with "a definite and firm conviction on the entire record that a mistake has been made." *Klosterman v. Hickel Inv. Co.,* 821 P.2d 118, 122 (Alaska 1991) (quoting *Parker v. Northern Mixing Co.,* 756 P.2d 881, 891 n. 23 (Alaska 1988)).

The trial court concluded that MOA breached its contract with the retirees by diminishing their post-retirement medical benefits. It found that the parties intended when they entered into the CBAs to assure represented members that their retirement benefits would not be decreased if they retired during the term of the contract. In arriving at its conclusion, the trial court employed Alaskan contract principles enumerated in *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767 (Alaska 1982), *Peterson v. Wirum,* 625 P.2d 866, and *Wright v. Vickaryous,* 598 P.2d 490 (Alaska 1979). Although the trial court also considered applicable federal law, it did not rely on any legal presumptions or inferences federal courts use when considering changes in post-retirement medical benefits.

Although the parties urge us to apply conflicting presumptions favorable to their side,[6] we agree with the trial court that traditional contract principles are sufficient to decide this case. A presumption or inference should be used only when traditional contract principles fail. *See, e.g., Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 609 (7th Cir.), *cert. denied,* 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) (stating that in contract interpretation, default rules such as presumptions should only be used after extrinsic evidence has been considered).

MOA initially argues that the language of the CBAs does not indicate an intent to vest. Citing *Bidlack,* MOA contends that the absence of clear language showing an intent to vest indicates a lack of an intent to vest. MOA argues that if the parties had intended the benefits to vest, they would have employed words like "vested," "accrued," or "guaranteed." That usage would have simplified resolution of this dispute, but those terms are not prerequisites to

---

5. In *Wright v. Vickaryous,* 598 P.2d 490, 497 n. 22 (Alaska 1979), we noted that we do not require a preliminary finding of ambiguity before evaluating extrinsic evidence.

6. Relying on *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 606–07 (7th Cir.), *cert. denied,* 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993), MOA argues that a presumption exists against the vesting of post-retirement medical benefits. In *Bidlack,* the Seventh Circuit, sitting en banc, seems to have limited the strong anti-vesting rule enunciated in *Senn v. United Dominion Indus.,* 951 F.2d 806 (7th Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). The retirees argue that if any presumption applies it should be a pro-vesting presumption, citing such cases as *International Union, UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1482 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). In *Yard–Man,* the Sixth Circuit applied a pro-vesting presumption, reasoning that the context in which the collective bargaining agreement was negotiated, and the fact that retirees are not subject to mandatory bargaining during collective bargaining, create an inference that the parties intended retiree medical benefits to vest. *Id.*

finding the parties intended the benefits to vest.

 Even though, as MOA correctly notes, the language of the CBAs does not explicitly indicate an intent to vest post-retirement medical benefits at the time of retirement, the language is consistent with such an intent. In such circumstances, courts should turn to extrinsic factors to determine contract meaning. Trial courts have broad latitude in looking at extrinsic evidence.[7] The trial court in this case properly considered extensive extrinsic evidence.

### 1. Negotiation histories

The APDEA and IAFF CBAs have separate negotiation histories.[8] The trial court, however, found that since at least 1980, it was MOA's policy to keep the police and firefighter benefits as similar as possible. The testimony of former Mayor Sullivan supports the court's finding. Although we will separately review the negotiation histories of the APDEA and the IAFF CBAs, MOA's stated policy lends support to the trial court's conclusion that the parties intended to vest post-retirement benefits under both sets of CBAs.

### a. APDEA contract negotiations

 The first APDEA CBA at issue here governed from July 1980 through October 1982. The pertinent language, *see supra* p. 253, was the same in subsequent CBAs. The trial court found that "[w]ith respect to [the 1980 APDEA CBA], the intent of both parties was to assure that those represented employees who retired prior to the expiration of that contract received medical retirement benefits that would not be reduced or otherwise impaired subsequent to their retirement."

MOA argues that the court incorrectly found that the APDEA contract was intended to match the command officers' post-retirement medical benefits under PERS and ACO 77–257. It argues that if MOA intended to bind itself to terms beyond the duration of the agreement it would have accepted the APDEA's proposed language that "[t]his provision will remain in effect in this and all subsequent agreements. Coverage under this provision may not be diminished." MOA contends that it rejected APDEA's proposed language because it did not want to eliminate this issue from all future negotiations. Instead, the parties settled on the sentence: "Coverage under this provision may not be diminished during the term of this agreement." MOA contends that this compromise language was intended to limit the level of guaranteed benefits to the three-year term of the agreement.

The trial court found, however, that this was not the intent of the various proposals. The court found that APDEA's offer was intended to "obligate MOA to provide a guaranteed level of coverage to *all future retirees in perpetuity*." (Emphasis added.) In essence, the trial court found that if the APDEA language had been accepted, the level of retirement medical benefits could never be renegotiated, even for future retirees. In comparison, the compromise language actually adopted vested benefits for those retiring during the operating CBA, but allowed the post-retirement benefits of active employees to be negotiated in future CBAs.

The record supports this finding. The lead MOA negotiator, Bill Smith, testified that he understood the language APDEA proposed would obligate MOA to provide the same benefits for future retirees. The testimony of APDEA's chief negotiator, Fred Di-

---

**7.** In *Peterson* we listed the following types of evidence that could be useful:

> [T]he language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated.... The conduct of the parties after the contract was entered into is generally considered to be admissible as a probative extrinsic aid to determining the intent of the parties when they made the contract.

625 P.2d at 870 n. 7.

**8.** MOA argues that it was clear error to deny its motion to divide the class. Because MOA fails to develop this argument, we consider it to have been waived. *Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991). We also note that the parties stipulated that the legal issues in this case were common to the APDEA and IAFF CBAs.

chter, also supports the court's finding. He testified that during the 1980 negotiations he researched post-retirement medical benefits and concluded that they were necessarily vested. He testified that he communicated his findings to Smith on several occasions and that Smith never contradicted or voiced opposition to Dichter's conclusion.[9]

MOA claims that ACO 77–257 was intended to be a twenty-year commitment rather than open-ended. MOA therefore contends that the parties could not have intended the APDEA and IAFF CBA retiree benefits to vest if the parties simply intended to match the benefits provided to command officers. MOA's argument is contrary to the language of ACO 77–257, which states that benefits will "cease when the retired member is no longer eligible to receive a monthly benefit." The ordinance also states that eligibility will be available to those who are entitled to receive a "presumably permanent monthly benefit from said retirement plan." Nowhere does the ordinance state that it is limited to twenty years. There was testimony the Assembly was fully informed the ordinance imposed an "open-ended commitment."

■ The negotiation history of the APDEA CBA supports the trial court's finding. MOA cites evidence supporting its position; however, under the clear error standard of review we do not reweigh the evidence heard by the trial court. *Horton v. Hansen,* 722 P.2d 211, 215 (Alaska 1986); Alaska R.Civ.P. 52(a). We conclude that the trial court did not commit clear error in finding that the parties intended to vest post-retirement medical benefits for APDEA retirees.

#### b. *IAFF contract negotiations*

■ The first IAFF contract in dispute was in effect January 1981 through December 1983. It contained the retiree health benefits language quoted above. Subsequent IAFF agreements contained the same language.

The trial court found that MOA intended the 1981–83 IAFF agreement "to provide a level of medical retirement coverage to represented IAFF employees similar to that provided to the command officers under AO 77–257."

MOA argues that the trial court ignored extrinsic evidence that MOA did not intend to vest retiree benefits.[10] There is no indication the trial court ignored this evidence. Furthermore, following review of the Sullivan and French testimony, we conclude that it is more ambiguous than MOA contends.

Other evidence supports the trial court's finding. A November 1979 MOA "Response to IAFF Proposal" stated that the MOA negotiator would recommend that the retirees be provided "the same level and type of p[o]st retirement medical benefits as all Municipal employees receive under PERS." (Emphasis omitted.) Since PERS benefits are vested, it is fairly inferable that the parties also intended the IAFF benefits to vest. (This inference is also supported by evidence of the course of performance of the CBA.) The trial court's finding was not clearly erroneous.

#### 2. *Evidence of post-formation conduct*

■ Alaska courts may use extrinsic evidence regarding the intent of the parties "to

---

9. MOA argues that Dichter's testimony "actually shows that the parties most assuredly did *not* have that intent." It argues that Dichter's testimony "endorses the Municipality's position that there was no mutual intent to guarantee retiree medical benefits coverage beyond the term of the [CBA]." MOA cites to only a small portion of Dichter's testimony. Other passages clearly support the retirees' position. When asked whether the language in the medical benefits section was intended to freeze benefit levels for police officers who had already retired, he replied "yes." We defer to the finding of the trial court which heard the testimony and observed the demeanor of the witnesses, including Dichter. *Crook v. Mortenson–Neal,* 727 P.2d 297, 302 (Alaska 1986).

MOA also urges us to "give no credence to Dichter's research conclusion." Although we do not accept the research conclusion as legal grounds for our opinion, we accept the trial court's finding that Dichter reached a conclusion which he communicated to the MOA negotiator.

10. MOA relies on the testimony of Smith, MOA's chief negotiator, that MOA did not intend the CBA to vest benefits. It also argues that the testimony of former Mayor Sullivan and Emily French, MOA's chief negotiator under Mayor Knowles, supports a conclusion that MOA did not intend post-retirement medical benefits to vest.

interpret a contract regardless of whether the contract appears to be ambiguous on its face or not." *Peterson,* 625 P.2d at 871; *Vickaryous,* 598 P.2d at 497 n. 22. We have recognized that the parties' conduct after entering into the contract is probative of the intent behind the agreement. *Peterson,* 625 P.2d at 870 n. 7.

MOA argues that extrinsic evidence is relevant "insofar as it relates to 'the time the contract was made.'" MOA contends that "the trial court erred in relying on the testimony of a number of people who were unknowledgeable about CBA intent, or were merely voicing opinions independent of CBA intent." In essence, MOA argues that the only people who may testify about the intent of the parties to the CBA are those who were in the negotiating room during formation of the contract. It relies on *Norton,* 677 P.2d at 881, which it claims found that "the testimony of a party's attorney who was not present at contract negotiations" was not indicative of contract intent. *Norton* is readily distinguishable. We there held that the testimony of a title company manager who drafted a contract was not indicative of the parties' intent both because his knowledge was more speculative than first-hand, and because it shed no light on what the parties contemplated with respect to the events that ultimately occurred.[11] *Id.*

■ In comparison, the testimony on which the trial court relied here and which MOA characterizes as irrelevant was from persons with first-hand knowledge of party intent and conduct. (Because institutions are the parties to the CBAs, party intent may be demonstrated by knowledgeable individuals who think and act for the institutions.) MOA consequently argues that it was error to rely on the testimony of John Franklin, Deputy Fire Chief and Fire Chief during the Sullivan administration, and Commissioner of Public Safety and City Manager during the Knowles administration, because "Franklin testified that he never directly participated in any of the CBA negotiations." The trial court found that

> Franklin understood that, from the late 1970's through the Knowles administration, the administration was obligated to maintain post-retirement medical benefits to current retirees without diminishment. He widely communicated that understanding to many other firefighters and MOA employees.

The trial court did not err in relying on Franklin's testimony concerning actions he took based on his understanding of the CBAs.

■ We likewise reject MOA's arguments directed at the testimony of other MOA employees. Testimony of the following persons was correctly considered by the trial court and supports that court's findings: former Mayor Tony Knowles; Ron Otte, Deputy Chief and Chief of Police during the Knowles administration; former municipal attorneys Jerry Wertzbaugher and Richard Kibby; Sally Wood, MOA benefits specialist; and MOA labor specialist John Marton. These witnesses were all involved in performing the contracts and all testified that they operated under the assumption that retiree medical benefits were vested.

Gentile class members also supported the trial court's findings by testifying that in conversations with MOA personnel shortly before retirement, they were told their benefits would not be subject to reduction.[12] This testimony is substantial evidence that the parties believed the benefits to be vested. The record also supports a conclusion that this understanding prevailed when the par-

---

**11.** MOA apparently considers that case particularly instructive because it involved a witness who was not present at contract negotiations. We did not base our holding on that fact, however, and instead relied on his demonstrated lack of nonspeculative, first-hand knowledge. *Norton,* 677 P.2d at 881.

**12.** The court explicitly gave additional weight to their testimony because of

[t]heir demeanor; the clarity of their recollections; their training as former Public Safety officers to be careful, responsible witnesses; the importance of these conversations to the retirees, who were thus more likely to remember them; and the consistency of the testimony with all or parts of the testimony of MOA employees Pam Barbeau, Chuck Shelton, Carol Watts.

ties negotiated and entered into subsequent APDEA and IAFF contracts.

We consequently hold that the trial court did not err in concluding that MOA breached the APDEA and IAFF CBAs by unilaterally decreasing the retirees' medical benefits. It correctly entered a permanent injunction preventing any future attempt to decrease those benefits.[13]

## B. Judicial Authority to Grant Relief

MOA argues that the Assembly was not fully aware of the costs involved when it accepted the APDEA and IAFF CBAs. MOA compares the acceptance of the CBAs with the Assembly's previous approval of ACO 77–257, which gave command officers lifetime post-retirement health benefits. When the Assembly passed ACO 77–257, it had access to a twenty-year estimate of the costs of the benefits. MOA argues that because there was no similar cost estimate for the CBAs, the trial court's judgment saddles the Municipality with a financial obligation the Assembly never accepted. It argues that the trial court's judgment usurped the Assembly's power and should be considered "an unauthorized promise by a government official to appropriate government funds, which under Alaska [law] is of no force and effect."

MOA's argument is without merit. The trial court did not err in finding that MOA entered into contracts that granted vested benefits to the retirees. Consequently, MOA's asserted failure to comprehend or fund its liability does not excuse its contractual obligations on a theory the trial court somehow usurped the power of the MOA Assembly.[14]

## C. Covenant of Good Faith and Fair Dealing

As a matter of law, all contracts in Alaska contain an implied covenant of good faith and fair dealing. *Alaska Pacific Assurance Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990); *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979). This covenant primarily sounds in contract; in limited situations, however, it may sound in tort. *Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.*, 797 P.2d 622, 626 (Alaska 1990); *State Farm Fire & Casualty Co. v. Nicholson*, 777 P.2d 1152, 1156 (Alaska 1989). In Alaska, breach of the covenant is a tort only if it is in the surety or insurance context. *See Loyal Order of Moose, Lodge 1392*, 797 P.2d at 626–27 (holding tort claim based on covenant available in surety context); *Nicholson*, 777 P.2d at 1156–57 (holding insurance contracts are subject to tort action for breach of duty of good faith and fair dealing). We have specifically declined to extend a tort remedy to commercial and employment contracts. *State v. Transamerica Premier Ins. Co.*, 856 P.2d 766, 774 (Alaska 1993) (refusing to extend tort to commercial contract); *ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1153–54 (Alaska 1988) (refusing to extend tort based on covenant to employment contract).

The trial court held that MOA was potentially liable in tort because it was the underwriter of the health insurance plan and was in a position of trust in relation to the retirees. The retirees contend that the court failed to properly apply the tort standard to MOA. They argue that the trial court's finding that MOA did not breach the covenant of good faith and fair dealing was clearly erroneous and unsupported by the record.

13. The trial court also held that by diminishing the medical benefits, MOA violated article XII, section 7 of the Alaska Constitution. Because the class members' contract claim fully resolves the question of whether the medical benefits vested when the covered employees retired, it is unnecessary to consider claimants' constitutional claim.

14. MOA does not argue mistake of fact. When the Assembly passed ACO 77–257 it understood that it was taking on an "open-ended" commitment. The cost estimates varied from $450,000 to $3,450,000, and the Assembly was informed that the estimates were based on nothing more than guesses at the projected rise in health care costs. We must presume that in accepting the CBAs the Assembly was aware of what it was voting on and the financial implications of its actions. *See Property Owners Ass'n v. City of Ketchikan*, 781 P.2d 567, 572 (Alaska 1989) (holding city council's legislative decisions presumed correct). MOA has presented no evidence that would indicate otherwise.

■ We do not reach the merits of the retirees' arguments because we believe the trial court erred in subjecting MOA to potential tort liability for its actions. Public policy concerns do not require the imposition of tort liability in this case.

We first recognized the tort of breach of the duty of good faith and fair dealing in *Nicholson*, 777 P.2d at 1156.[15] We there noted that an action in tort provides a remedy for harm to insureds in situations where there is no breach of an express contract or where contract damages fail to adequately compensate insureds. *Id.* at 1156. A primary concern is that without the threat of tort liability, insurance companies may be "encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than that due under the policy." *Scott Wetzel Serv., Inc. v. Johnson*, 821 P.2d 804, 810 (Colo.1991) (quoting *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313, 318 (R.I.1980)); *Nicholson*, 777 P.2d at 1156.

Insurance companies have been subjected to tort liability for breaching the covenant of good faith in resolving claims covered by their insurance policies. *See Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 485, 510 P.2d 1032, 1037 (1973) (holding that tort liability exists if company refuses without proper cause "to compensate its insured for a loss covered by the policy"); *Noble*, 624 P.2d at 868 (holding tort liability applies when "dealing with its insured on a claim"); *Nicholson*, 777 P.2d at 1157 (holding that tort liability exists for "insurer's bad faith failure to settle a first-party claim").

It is unnecessary to decide here whether MOA would be subject to tort liability for failing to deal fairly and in good faith in the settlement of a covered insurance claim. That is not the nature of the retirees' claim. They instead claim that MOA breached the covenant of good faith and fair dealing by unilaterally decreasing the insurance coverage required by the CBAs. Although insurance is the topic in dispute, MOA breached the CBAs, not policies of insurance. The public policy concerns are fundamentally different. When the parties enter into a CBA, they are not in substantially disparate bargaining positions. APDEA and IAFF are unions. They negotiate with MOA at arm's length. CBAs are generally not form contracts that the union must either accept or reject. Evidence of bargaining over the disputed contract language establishes that the CBAs were not adhesion contracts.

Although the retirees are in a poorer financial position than MOA, the context that makes insurance claim cases compelling is not present. The retirees are not like insureds who, after suffering a loss from which a claim arises, may find themselves at a great disadvantage, potentially forcing them to accept less than the amount of their loss. We believe that CBAs are closer to commercial contracts than to insurance contracts. In *Transamerica Premier Ins. Co.*, we held that in commercial contracts, "a tort for breach [of the covenant of good faith] arises only when 'a party's conduct ... rises to the level of a traditionally recognized tort.'" 856 P.2d at 774 (quoting *Akers*, 753 P.2d at 1154). We therefore conclude that MOA was not subject to tort liability under the covenant of good faith and fair dealing. Because the retirees succeeded on the breach of contract claim, it is unnecessary to determine whether

---

15. In that case we quoted an Arizona Supreme Court opinion that recognized several public policy arguments warranting application of the tort. It stated:

We are persuaded that there are sound reasons for recognizing the rule announced in *Gruenberg* [*v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal. Rptr. 480, 485, 510 P.2d 1032, 1037 (Cal. 1973)]. The special nature of an insurance contract has been recognized by courts and legislatures for many years. An insurance policy is not obtained as protection against calamity. In securing the reasonable expectations of the insured under the insurance policy there is usually an unequal bargaining position between the insured and the insurance company.... Often the insured is in an especially vulnerable economic position when such a casualty loss occurs. The whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim. We have determined that it is reasonable to conclude that there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort. *Id.* at 1155 (citations omitted) (quoting *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866, 867–68 (1981)).

MOA breached a contractual duty of dealing in good faith.

### D. *Attorney's Fees*

Invoking Civil Rules 23 and 82, the retirees moved for an attorney's fees award of $2.8 million.[16] MOA, arguing that it was the prevailing party on a substantial portion of the litigation, moved for an attorney's fees award to be set off against the retirees' fee recovery. Implicitly rejecting MOA's motion, the trial court concluded that the retirees were the prevailing parties. It awarded them attorney's fees of $342,531, 100% of "actual" hourly fees calculated as the product of counsels' usual hourly rates and the hours spent.[17] This award thus exceeded the award called for by Rule 82(b)(2) (thirty percent of actual reasonable fees where no money judgment is recovered), but the court declined to award a risk premium under Rule 82 and also declined to fund an enhanced award via reduced future benefits to the retirees.

The retirees argue on appeal that the trial court should have awarded greater-than-actual (enhanced) attorney's fees. They argue several theories in support: that public policy favoring the promotion of class action lawsuits and the availability of competent counsel requires enhanced fees, that a common fund analysis applies, and that, at the least, the class members should pay for the risk factor portion of the fees. Underlying each theory is the retirees' premise that compensation for class action attorneys should recognize the risk of not being paid.

Before we address these arguments, we note that the class representatives and their attorneys apparently agreed that the attorneys would receive whatever fees the trial court awarded at the conclusion of the case, and would receive nothing if the class did not prevail. At the fee hearing below, class counsel stated they had no right to recover directly from the class members any unpaid balance of accrued fees.[18] Thus, both the payment and the amount of any fees the attorneys might recover were contingent on the class prevailing and entry of a fee award.

This arrangement appropriately recognized the broad discretion of trial courts in assessing attorney's fees in class actions. *See, e.g.*, 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1803, at 493–94 (2d ed. 1986) ("The court's authority to reimburse the parties stems from the fact that the class action is a creature of equity and the allowance of attorney-related costs is considered part of the historic equity power ....") (hereinafter *Federal Practice and Procedure*). In comparison, typical non-class action retention agreements express or imply definite standards for calculating the fees clients are to pay their attorneys, either on an hourly rate basis or on a percentage of a contingent monetary recovery. This case thus differs from the typical Alaska non-class action suit, in which a prevailing party moves under Rule 82 for an award requiring the losing party to make the prevailing party partially or completely whole for the fees the prevailing party must pay its attorneys under a retention agreement.

16. This proposal was based on a percentage of the benefits at stake—allegedly worth $28 million—under a common fund theory. Retirees noted that at rates up to $195 per hour, the hourly fees would have been $342,531. They proposed alternative awards, the smallest of which was $1,027,593, using the hourly fees as a lodestar with a multiplier of three. They argued that the award should include a risk premium, and should be paid by MOA. The class representatives proposed alternatively that $1,462,531 be paid their attorneys, $1,120,000 of which would be a "risk factor" and would ultimately be contributed by the class members themselves.

17. The fees decision was entered June 1, 1994. Because both sides filed their fees motions after amendments to Rule 82 became effective on July 15, 1993, the trial court should have applied the amended rule. Instead, the trial court applied the prior version of Rule 82. The 1993 amendments added eleven specific and general criteria a trial court might employ in deviating from an award calculated under Rule 82(b)(1) or Rule 82(b)(2). Alaska R.Civ.P. 82(b)(3). The former rule applied by the trial court permitted it to award fees based on, among other things, the value of services provided. We analyze the retirees' appeal under the amended rule.

18. As one fee award alternative, however, class counsel reserved the right to seek fees from the class members pursuant to a common fund award that would have resulted in slightly reduced benefits to the class over time.

Rule 82 governs any award of attorney's fees to be paid to retirees by MOA. "Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule." Alaska R.Civ.P. 82(a). No other "law" or agreement applies here.

This court has long recognized that "the purpose of Civil Rule 82 is to afford reasonable partial compensation for attorney's fees to the winning civil litigant." *Wise Mechanical Contractors v. Bignell*, 718 P.2d 971, 973 (Alaska 1986) (citing *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 588 (Alaska 1973), and *Irving v. Bullock*, 549 P.2d 1184, 1190 (Alaska 1976)). *See also Childs v. Copper Valley Elec. Ass'n*, 860 P.2d 1184, 1190 (Alaska 1993) ("attorney's fees awarded under Alaska Civil Rule 82, ... are intended to provide reasonable partial compensation"); *In re Soldotna Air Crash Litigation*, 835 P.2d 1215, 1225 n. 2 (Alaska 1992) ("Civil Rule 82 allows the award of partial attorney's fees to the prevailing party in a civil action"). "The supreme court has identified Rule 82's primary goal as partially reimbursing a prevailing party for attorney's fees." Alaska Judicial Council, *Alaska's English Rule: Attorney's Fee Shifting in Civil Cases* 52 (1995).

■ In *Tobeluk v. Lind*, 589 P.2d 873 (Alaska 1979), this court compared fee awards under Civil Rule 82 and the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. We noted: "The Alaska Rules and Federal statute are similar in that both provide the court with the discretionary authority to award attorneys' fees to a prevailing party, and both intend fees awards to

be compensatory rather than punitive." *Tobeluk*, 589 P.2d at 876. We then observed:

> Despite the above similarities, the two fee award provisions are based on dissimilar underlying policies. The purpose of Rule 82 is to partially compensate a prevailing party for the expenses incurred in winning his case. It is not intended as a vehicle for accomplishing anything other than providing compensation where it is justified. In comparison, the explicit purpose of the fee shifting provision in the federal statute, 42 U.S.C. § 1988, is to encourage meritorious claims which might not otherwise be brought.

*Id.* (citations and footnote omitted).[19] Given this long-recognized purpose, Rule 82, both before and after its amendment, cannot ordinarily be used to award to a prevailing party an amount larger than the party has agreed to pay its attorneys.[20]

■ Rule 82 requires the trial court to decide what portion of the fees incurred by the prevailing party will be assessed against the losing party. In the usual non-class action case, the fees incurred by the prevailing party are set by contract and can be calculated without judicial intervention. "Actual" fees are those the party agrees to pay its lawyer. Because the class representatives in this case agreed to pay their lawyers whatever fees the court awarded, however, the "actual" fees were not necessarily limited to hourly fees. To determine the Rule 82 award, the trial court had to: (1) determine the compensable value of the services the attorneys rendered to the class, and (2) apply Rule 82 to the amount calculated in Step 1 to decide how much MOA should pay.[21] (Part III.D.3 below discusses a potential conse-

---

**19.** We have recognized limited exceptions to the partial compensation purpose of Rule 82 when the losing party has engaged in frivolous or bad faith litigation tactics, *State, Dep't of Revenue v. Allsop*, 902 P.2d 790, 795 (Alaska 1995), or one party is a public interest litigant which may recover full reasonable fees if it is the prevailing party, but is not liable for a fee award if it is not the prevailing party. *Eyak Traditional Elders Council v. Sherstone, Inc.*, 904 P.2d 420, 422 (Alaska 1995); *Hickel v. Southeast Conference*, 868 P.2d 919, 923 (Alaska 1994). These exceptions do not apply here.

**20.** In cases where the attorney charges no fee or a lower than usual fee, however, the proper approach is to value the attorney's services and to make a Rule 82 award which is some fraction of this value. *Arctic Slope Native Ass'n v. Paul*, 609 P.2d 32, 38 (Alaska 1980).

**21.** Thus, for illustration purposes only, assuming the court were to decide in Step 1 the value of the services was $1,200,000, and in Step 2 that under Rule 82 the class should be awarded forty percent of the value of the attorney's fees, the award against MOA would be $480,000. Per the retention agreement, the class representatives would pay counsel the $480,000.

quence if a Step 2 award is less than the Step 1 calculation.)

We now consider the theories the class representatives advance in support of their request for an enhanced fee award.

### 1. *Enhancement of actual attorney's fees*

The retirees argue that the trial court erred in failing to award enhanced fees against MOA, on the theory that public policy and equity require a risk premium to encourage the "effective and socially beneficial use of Rule 23" and to ensure that attorneys in class action cases "are not put off by the necessarily speculative nature of their compensation."

We have previously upheld the award of enhanced fees in context of workers' compensation. *Wise*, 718 P.2d at 974–75. In *Wise,* we stated that an enhanced fee award was proper because of the need to provide incentives to attorneys to represent injured workers. *Id.* Incentives are needed, we reasoned, because of the inability of certain plaintiffs to pay an hourly rate and the financial risk posed by contingency fee arrangements. We stated:

> If an attorney who represents claimants makes nothing on his unsuccessful cases and no more than a normal hourly fee in his successful cases, he is in a poor business.... As we have noted, the objective of awarding attorney's fees in compensation cases is to ensure that competent counsel are available to represent injured workers. This objective would not be furthered by a system in which claimants' counsel could receive nothing more than an hourly fee when they win while receiving nothing at all when they lose.

*Id.* at 975 (citations omitted). Nonetheless, in *Wise* we distinguished workers' compensation cases from cases in which Rule 82 governs fee awards:

> In workers' compensation cases the objective is to make attorney fee awards both fully compensatory and reasonable so that competent counsel will be available to furnish legal services to injured workers. *Wien Air Alaska v. Arant,* 592 P.2d 352, 365–66 (Alaska 1979). By contrast, the purpose of Civil Rule 82 is to afford reasonable partial compensation for attorney's fees to the winning civil litigant.

*Id.* at 973.

■ Awarding an enhanced fee, i.e., an amount more than the party agreed to pay its attorney, is fundamentally contrary to the purposes behind Rule 82, and would represent a marked departure from the policy behind that rule.[22]

■ As indicated above; however, that does not mean a Rule 82 award in this case could not exceed the product of the hours worked and the attorneys' hourly rates. In determining the value of the services under Step 1, the trial court may take into account the same policy considerations the class representatives advance in seeking a Rule 82 award exceeding the hourly basis calculation.[23] The need to promote the efficient use of court resources via class action litigation and the potential difficulty of attracting capable counsel are some of the relevant factors a trial court might consider in evaluating the services in Step 1.[24] We note, however, that a trial court could also conclude that the potential for recovering money damages may provide capable attorneys sufficient incentive to bring a case which happens to end without entry of a money judgment.[25] Further, we

---

**22.** Our holding here does not preclude a court from shifting fees greater than those agreed to by an attorney charging no fees or lower than usual fees. *See* discussion of *Arctic Slope Native Ass'n,* supra note 20.

**23.** The trial court noted that the parties disagree about the value of the judgment to the class. On remand, the trial court may require further argument on this issue and factor this dispute into its calculation of the reasonable fees.

**24.** One court has stated that "it is not the function of judges in fee litigation to determine the

equivalent of medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 568 (7th Cir.1992) (Posner, J.) (reversing trial court fee award to class action counsel where the trial court refused to award a risk multiplier).

**25.** The retirees also sought additional tort and contract damages. Had they obtained a damages award, their attorneys presumably would have shared in part of that award. A court

previously observed that "generally, full compensation at a reasonable rate per hour will prove adequate to encourage appropriate public interest litigation." *Thomas v. Bailey*, 611 P.2d 536, 541 (Alaska 1980).

The trial court apparently based its denial of the class representatives' motion for an enhanced fees award on a belief it did not have discretion to consider risk enhancement under Rule 82. Because risk enhancement is a factor which could have been considered at Step 1 of the fee calculation, and because we conclude that the trial court should analyze the fee issue using the model suggested above, it is necessary to remand this issue.[26]

### 2. Common fund analysis

The retirees offer the common fund doctrine as one method for achieving an enhanced fee award. They argue that the common fund analysis applies here because their lawyers preserved a common fund equal to the present value of the retirees' medical benefits package. The retirees request that the value of the common fund determine the *amount* of the fees, but that MOA be their *source*.

Under the common fund doctrine, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980).

In our recent decision of *In re Estate of Brandon*, 902 P.2d 1299 (Alaska 1995), we discussed with approval the common fund doctrine. *Id.* at 1319 n. 23 (involving multiple tort claimants potentially benefited by the efforts of the parties' different attorneys). We have now squarely adopted this doctrine in *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 754–56 (Alaska 1996). As we held in *Edwards*, the common fund doctrine and Rule 82 have fundamentally different, but reconcilable, purposes: the former is a fee-sharing rule, and the latter is a fee-shifting rule. *Id.* at 755–56. Both principles can apply in an appropriate case, where the common fund doctrine determines the fees that benefited class members owe their attorneys, and Rule 82 determines what part of those fees should be shifted to the losing party. The proper case is one where the value of the attorney's services is not contractually specified and the trial court must calculate that value in Step 1 of the model discussed above. Even though that value could not properly be directly assessed against the losing party under Rule 82, the separate Step 2 analysis would potentially permit part of the value of those services to be shifted to the losing party under Rule 82.

MOA argues, however, that the common fund doctrine does not apply here because no common fund was recovered. In *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 625–26, 24 L.Ed.2d 593 (1970), the United States Supreme Court held that the absence of a monetary recovery "does not preclude an award based on [the common fund] rationale." *Mills* involved a fee award to be paid by the defendant corporation in a

---

might conclude that the attorneys took the risk that they would be unsuccessful in all or part of this case in exchange for a chance at a large contingent fee recovery under a common fund analysis, and that awarding a risk premium is not needed to encourage competent counsel to accept similar class action cases in the future.

As was done here, class representatives or counsel may offer affidavits asserting that it would be difficult or impossible to obtain other capable counsel absent the potential recovery of enhanced fees. Although the actual difficulty experienced by class representatives in retaining counsel is probative, a court need not unquestioningly accept assertions that absent enhanced fees, capable counsel could not have been retained, or cannot be obtained in the future.

Such assertions are potentially speculative and self-serving.

**26.** MOA asserts that it has cross-appealed from the fee award, and that the court erred in failing to apportion fees by issue and in awarding full fees under Rule 82. However, MOA failed to properly raise and perfect its cross-appeal. *See supra* note 4. *Jackson v. Nangle*, 677 P.2d 242, 247 n. 3 (Alaska 1984); *Alaska Brick Co. v. McCoy*, 400 P.2d 454, 457 (Alaska 1965). We have therefore considered only the fees issues retirees have raised.

The fact circumstances on which MOA would rely in its unpreserved attorney's fees appeal may be relevant on remand when the trial court revisits the retirees' enhanced fees request.

successful stockholder derivative action. The Court stated:

> The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on [the common fund] rationale. Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a "common fund" for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses.

*Id.*

In *Hall v. Cole,* 412 U.S. 1, 5 n. 7, 93 S.Ct. 1943, 1946–47 n. 7, 36 L.Ed.2d 702 (1973), the Court reiterated this holding in context of an action by a union member challenging his expulsion from the union, stating:

> [I]n *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), we held that the rationale of these cases must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation "which corrects or prevents an abuse which would be prejudicial to the rights and interests" of those others.

*Id.* (citing *Mills,* 396 U.S. at 396, 90 S.Ct. at 627–28).

The superior court stated that *Mills* and *Hall* could be distinguished from the present case, and held that "the lack of a money judgment combined with the problem of determining the actual value of the judgment precludes this court from applying the common fund theory." Citing Alaska Civil Rule 23.1(j), the superior court stated that "*Mills* can be distinguished in that Alaska law provides for reasonable attorney's fees in derivative actions by shareholders." In our view, *Mills* cannot be distinguished on this basis, as the Supreme Court did not narrowly found its analysis of this issue on the derivative posture of *Mills,* as evidenced by its expansion of its holding in *Hall.* Likewise, the fact that *Hall* did not "invoke class action considerations" did not make it distinguishable.

We hold that the absence of a traditional fund does not preclude application of the common fund rationale in the appropriate case. We need not consider whether a common fund rationale would be applicable in every case in which no fund is recovered. In this case, it is appropriate to apply the rationale during Step 1, when the attorneys' services are evaluated. In *Edwards,* we held that trial courts have discretion to choose between the lodestar and percentage of the common fund methods in deciding reasonable fees under the common fund doctrine. *Edwards,* 920 P.2d at 758. Both of those methods may yield fees exceeding fees calculated on a strict hourly basis. In this case, any difficulty in calculating the value of the common benefit may make the percentage approach inappropriate. Nonetheless, that would not make the common fund or common benefit analysis altogether inappropriate, because other evaluation methods, such as a lodestar formula, are available.

Finally, MOA claims *Moses v. McGarvey,* 614 P.2d 1363 (Alaska 1980), supports MOA's position that the common fund theory does not support a greater-than-actual fee award. MOA apparently regards the product of the hours spent and the usual hourly rate to be retirees' "actual" fees. As we intimated above, this view is incorrect, because the "actual" fees are those the clients agreed to pay their attorneys. Because these plaintiffs agreed to pay whatever the court awarded, their "actual" fees are not necessarily limited to fees calculated on a strict hourly basis. Neither *Moses* nor Rule 82 prevents the trial court on remand from awarding fees greater than those calculated on an hourly basis in this case. Therefore, we hold that the trial court may apply the common fund doctrine in calculating fees under Step 1 on remand.

### 3. Requiring retirees to contribute to their attorney's fees

The class representatives alternatively asked the trial court to require all class members to contribute to the "risk factor" portion of class counsel's fees exceeding the

fees assessed against MOA under Rule 82.[27] The unnamed class members apparently had no prior formal notice of this request. The record does not clearly establish whether this request was consistent with the terms of the class representatives' fee agreement with counsel. For sake of this discussion, we assume it was. The trial court rejected this request because the entire class had not approved this procedure, and because "it would be quite cumbersome to administer, and has no legal support either in case law or legislative history." The class representatives argue on appeal that if MOA is not ordered to pay enhanced fees, all class members should be "allowed" to share the value of their attorneys' services on a variation of the common fund doctrine.

■ When litigation bestows a benefit upon a class, the propriety of spreading the litigation costs among those benefited is well established. *See, e.g., Boeing*, 444 U.S. at 478, 100 S.Ct. at 749 ("[P]ersons who obtain the benefit of a lawsuit without contributing to the costs are unjustly enriched."). Due process concerns attendant to assessing fees against absent class members when a suit is unsuccessful do not arise when a class action creates a fund from which costs can be reimbursed. *Federal Practice and Procedure* § 1803, at 505; 3 Herbert B. Newberg, *Newberg on Class Actions* § 14.03, at 14–2 through 14–3 (3d ed. 1995). Newberg states:

> These self-appointed champions of the class, and their counsel, are not entitled to charge absent class members for reimbursement of attorneys' fees or litigation expenses if the class suit is unsuccessful.
>
> . . . .

... When, however, the class action successfully recovers a fund for the benefit of a class or when nonparties to the suit will share in those monies, it is long settled, based largely on windfall and unjust enrichment principles, that the attorneys who created that class recovery are entitled to be reimbursed from the common fund for their reasonable litigation expenses, including reasonable attorneys' fees.

*Id.* Precedent exists for class contributions to fees from benefits created or protected by a class action. *See, e.g.,* Yvonne W. Rosmarin & Daniel A. Edelman, *Consumer Class Actions, A Practical Litigation Guide* § 15.1.2, at 143–44 (3d ed. 1995) ("[I]n a successful action to construe a standard form insurance policy to provide ... greater ... benefits ... it could be argued that fees should be awarded against the company ... because ... the company has the ability to pass on the expense among the benefitted class in the form of higher premiums." (citing *Cosgrove v. Sullivan*, 759 F.Supp. 166, 169 (S.D.N.Y.1991) (fees to be paid by deducting one percent from all Medicare benefit payments disbursed by the Department of Health and Human Services pursuant to the judgment))).

■ Therefore, a trial court could conclude that class members should be required to pay something for the benefit they have received as a result of the attorneys' efforts, assuming the class's Rule 82 award is less than the value of the services contractually agreed upon or calculated in Step 1 when that procedure applies.[28] On remand, the trial court in its discretion may permit further argument and consideration of this issue.

---

27. The class representatives proposed that these contributions be funded by requiring MOA presently to advance $1.12 million to be paid class counsel as a "risk factor," and permitting MOA to recover this amount by making minor deductions from the retirees' future benefit payments.

28. We are mindful of the potential lack of adversity when class counsel asks the trial court to impose fees on the benefited class members under the common fund doctrine. Possible solutions include appointment of masters to decide fact issues or "special counsel" to represent the class and negotiate the fees issue with plaintiffs' counsel. *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir.1992) (suggesting that the trial court could, absent an adversarial presentation, appoint a special master to assess objective criteria of cost and performance); Christopher P. Lu, *Procedural Solutions to the Attorney's Fee Problem in Complex Litigation*, 26 U.Rich.L.Rev. 41, 62–63 (1991) ("special counsel"). It seems likely that in most disputes in which a trial court may award fees to the prevailing parties under Rule 82, the losing party will have ample incentive and standing to dispute the amount of fees to be calculated during Step 1.

## IV. CONCLUSION

For the reasons discussed above, we RE-VERSE IN PART and AFFIRM IN PART the superior court's September 3, 1993 and March 14, 1994 judgments, and REMAND the attorney's fees issue.

MOORE, C.J., not participating.