**PROPERTY OWNERS ASSOCIATION OF THE HIGHLAND SUBDIVISION A PORTION OF USMS 769, KETCHIKAN, ALASKA, Appellant,**

v.

**CITY OF KETCHIKAN, a Home Rule Alaska Municipal Corporation, Appellee.**

No. S–2760.

Supreme Court of Alaska.

Oct. 20, 1989.

Michael W. Flanigan and Susan M. Williams, Clark, Walther & Flanigan, Anchorage, for appellant.

Mitchell A. Seaver, Asst. Municipal Atty., and Russell W. Walker, Municipal Atty., Ketchikan, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case involves the construction and financing of capital improvements in the Highlands subdivision of the City of Ketchikan. Following construction, the Ketchikan City Council levied a special assessment against the land which benefitted from the improvements. The subdivision lot owners appeal the amount of the assessment and the interest rate charged during the payment period. The lot owners raise due process and estoppel issues, among others, in their attack on the Ketchikan City Council's financing decision.

### I.

In 1978, Charles and Mary Hoyt decided to subdivide a parcel of land in Ketchikan into thirty-two lots. They petitioned the Ketchikan City Council to create a local improvement district ("LID") encompassing the proposed subdivision. LIDs are vehicles by which private landowners may benefit from advantageous financing methods available to cities, such as tax free municipal bonds. The Hoyts asked the Council to provide LID financing for capital improvements including road, water, sewer, telephone, and power line installation.

Following a public hearing at which no objections were raised, the Council created the Highlands LID for the Hoyts' property. When the LID was created, the Council, developer, and city staff all contemplated that construction would be financed by the issuance of bonds. At that time, the maximum legal interest rate for LID bonds was

eight percent. Former Ketchikan Municipal Code [hereinafter KMC] 03.16.130.[1]

In May 1979, the Council amended the Highlands LID. Although it continued to authorize the issuance of bonds, the amendment also permitted interim construction financing through such short-term obligations as would be approved by the Council. Construction commenced with interim financing from the Ketchikan General Fund.

During 1980, it became clear that municipal bonds could not be marketed at eight percent due to an unprecedented rise in interest rates. In December 1980, the Council amended KMC 3.16.130 to remove the cap on special assessment bond interest rates.[2]

The capital improvements were substantially completed and inspected in October 1980, although work was not fully completed until August 1981. Until December 1980, the funds borrowed from the Ketchikan General Fund accrued interest at eight percent. Between December 1980 and January 1982, the funds accrued interest at eleven percent. In December 1981, the Council approved the final assessment roll which assessed total accrued construction, interest, and administrative expenses of $968,468.16 against the lot owners. The Council proposed that the lot owners pay the assessment over ten years at thirteen percent interest.

At a public hearing on the assessment on January 22, 1982, the lot owners objected to the amount of the assessment, the proposed thirteen percent interest rate, and the length of the repayment period. The Council passed a motion retaining the amount and the thirteen percent interest rate, but extended the repayment period from ten to fifteen years. The Council reaffirmed this decision in February 1982.

Certain lot owners identifying themselves as the Property Owners Association of the Highlands Subdivision appealed the assessment amount and repayment terms to the superior court. The owners moved for a trial de novo and shortly thereafter submitted the affidavit of real estate broker Charles Elliott.

The superior court ordered the Elliott affidavit stricken from the record as untimely and later denied the motion for a trial de novo. Following briefing and oral argument, the court affirmed the decision of the Council and entered final judgment. This appeal followed.

## II.

A municipality may create a LID to help property owners finance capital improvements. AS 29.46 (formerly AS 29.63). Ketchikan implemented its delegated authority in chapters 3.16 and 3.18 of the Ketchikan Municipal Code. A LID involves an agreement by the Council to pay interim construction costs. KMC 3.16.110.[3] The

1. Former KMC 3.16.130 provided that such "bonds shall bear interest at a rate not to exceed 8% per annum."

2. Current KMC 3.16.130 provides that such "bonds shall bear interest at a rate or rates to be determined by the city council."

3. KMC 3.16.110(e) and (f) state:
 (e) L.I.D. Funds. Each L.I.D. of the city shall be given a number in the ordinance or resolution creating the district, and each such ordinance or resolution shall create an "L.I.D. No. ___ Fund." Into such fund shall be paid all receipts pertaining to the L.I.D. including, but not limited to, proceeds from the sale of warrants and/or bonds, transfers from the city general fund and assessments as paid.
 Such funds shall be drawn upon for the purpose of paying construction costs of such

L.I.D., redemption of warrants and bonds and the payment of interest thereon.
 Within such fund, accounts such as may be necessary, such as construction revenue, bond redemption and sinking fund accounts, may be set up.
 (f) Warrants. The city may provide by resolution or ordinance for the issuance of warrants payable out of such L.I.D. fund in payment of the cost and expenses of any L.I.D. improvements. The warrants ... shall be redeemed either in cash or by exchange for special assessment district bonds of such district. Such warrants shall be redeemed in order of their number whenever there is enough money in such fund to redeem such lowest number warrant or warrants.
 Warrants may be issued to the city general fund when the general fund advances the costs of improvements.

Council may finance construction by issuing warrants or bonds, or by transferring funds from the city general fund. *Id.;* KMC 3.16.120(a).[4] Once the project is complete and the total costs known,[5] the Council levies a special assessment against the property benefitted by the improvements. The owners are entitled to notice[6] of the proceedings and may object to the assessment roll or any separate assessment during the public hearing. KMC 3.18.060.[7] After the assessment roll is completed, the Council establishes a repayment schedule and interest rate. KMC 3.18.070.[8]

### III.

The lot owners argue that they were deprived of due process of law because the levy of special assessments is an adjudicative function and they were not afforded trial-like procedures. Ketchikan argues that trial-like procedures were not required because the Council acted in its legislative capacity.

4. KMC 3.16.120(a) provides in full:
 Bonds to be entitled "L.I.D. No. ___, City of Ketchikan, Alaska, Bonds" may be issued to provide funds to pay any part or all of the costs of improvements in any special assessment district, provided that such bonds shall not be issued in a total principal amount in excess of such costs of improvement.

5. Total costs include construction costs, accrued interest, and administration expenses.

6. KMC 3.18.050(b), Contents of published notice, states in part:
 The published notice of such hearing shall specify the number of the L.I.D. and a short statement of the nature of the improvements completed therein and shall contain any other information deemed relevant by the council o[r] the city clerk, and shall notify all persons who may desire to object to such assessment roll or any of the separate assessments appearing thereon:

 (2) That at the time and place fixed for such hearing and at times to which the hearing may be adjourned the council will sit as a board of equalization for the purpose of considering the roll and the separate assessments appearing thereon; and
 (3) That at the hearing or the times to which it may be adjourned the council will consider the objections made and will correct, revise, raise, lower, change or modify the roll or any part thereof, or set aside the roll and order the assessment to be made de novo, and

■ This is a question of law upon which we exercise our independent judgment. *Langdon v. Champion,* 752 P.2d 999, 1001 (Alaska 1988). We review the decision of the Council directly because the superior court was acting as an intermediate court of appeals. *Barcott v. State, Dep't. of Pub. Safety,* 741 P.2d 226, 228 (Alaska 1987); *City of Nome v. Catholic Bishop,* 707 P.2d 870, 875 (Alaska 1985).

■ The question whether a governmental action is "legislative" or "adjudicatory" implicates important due process considerations. Where an act is deemed to be legislative, trial-type procedures need not be afforded to affected members of the public. The contrary is true where an act is deemed to be "adjudicatory." *See* 2 K. Davis, Administrative Law Treatise § 12:1, at 406–09 (2d ed. 1979) (citing *Londoner v. City of Denver,* 210 U.S. 373, 386, 28 S.Ct. 708, 714, 52 L.Ed. 1103 (1908); *I.C.C. v. Louisville & Nash. R.R.,* 227 U.S. 88, 91–

at the conclusion of such hearing or hearings will confirm the roll by ordinance or resolution.

7. KMC 3.18.060, Hearing objections and settlement of assessment roll, provides in full:
 At the hearing, all persons concerned may present their objections to the assessment or any part of it, and point out errors and inequities, and submit reasons for amendment and corrections. The council may continue the hearing from time to time. After the council has heard all objections and suggestions, it shall correct any errors which it finds in the assessment roll as originally made, and when the roll is finally settled, the mayor shall sign the assessment roll certifying that it is the assessment roll as finally settled by the council. The assessment roll as certified shall be recorded in the recorder's office, Ketchikan recording district, first judicial district, state of Alaska.

8. KMC 3.18.070, Assessment—Interest and method of payment, states in full:
 After the assessment roll has been completed, the council shall fix by resolution:
 (a) The type of payments, whether lump sum or installment;
 (b) The date of payment or payments;
 (c) The percentage of the total cost of the project which the first payment shall be equal to, if to be repaid in installments; and
 (d) The interest rate on all deferred payments.

92, 33 S.Ct. 185, 186–87, 57 L.Ed. 431 (1913)).

■ Assessment proceedings which affect individual taxpayers, rather than taxpayers as a group,[9] and which involve the ascertainment of facts material to those individuals are "adjudicatory." The requirement that an individual specifically targeted by a taxing authority be afforded a hearing has been interpreted to entitle the taxed party to trial-type procedures where disputed material facts must be ascertained. 2 K. Davis, *supra* p. 9, § 12:1, at 407.

■ The Council's decision in this case involved two components. First, the council decided how and at what interest rate it was going to fund the subdivision's improvements. This clearly involved a policy determination which is "legislative." The legislative character of the decision is evidenced by the fact that the Council did not sift through and decide evidentiary questions unique to any of the affected parties. *See Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413–14, 3 L.Ed.2d 1377 (1959) (where government action seriously invades individual interest and requires findings of fact, trial-type procedures are required).

■ A more difficult question is whether the Council's decision to charge the taxpayers for delays caused by work allegedly benefitting only the city was "legislative" or "adjudicative." The Council based its decision to charge the taxpayers for these delays on testimony that the work which caused the delays benefitted the taxpayers as well as the city.

We believe that this was a legislative decision because the decision affected a large development and a group of similarly situated taxpayers. To hold otherwise would encroach upon and make too cumbersome the legislative policy-making function.

9. *Compare Londoner,* 210 U.S. 373, 385–86, 28 S.Ct. 708, 713–14 (due process requires hearing where municipal tax is on particular property) *with Bi–Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441, 444–45, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915) (where tax applicable to

■ In a legislative assessment proceeding, due process requires notice and an opportunity to be heard, both of which were provided to the affected owners in this case. *See, e.g., Hinz v. City of Phoenix,* 118 Ariz. 161, 575 P.2d 360, 363 (App. 1978); *South Ferry St. Project v. City of Schenectady,* 72 Misc.2d 134, 338 N.Y.S.2d 730, 733–34 (Sup.Ct.1972); *Tramel v. City of Dallas,* 560 S.W.2d 426, 429–30 (Tex.Civ. App.1977). Because the lot owners received all the process due, we conclude that the superior court did not abuse its discretion in refusing to conduct a trial de novo. *See State v. Lundgren Pac. Constr. Co.,* 603 P.2d 889, 895–96 (Alaska 1979); *see also* Alaska Appellate Rule 609.

## IV.

■ The owners asserted that the changes which delayed completion of the project until August 1981 were undertaken at the behest of and for the exclusive benefit of the city. City staff members, however, indicated that the rerouting of one water line, which delayed the project until the spring of 1981, was required to remain eligible for grants from the Alaska Department of Environmental Conservation. The installation of overhead power and telephone lines by Ketchikan Public Utility, which was not completed until January 1981, was done at the request of the Hoyts and saved the project at least $60,000. Finally, replacement of one old wood stave water main, while beneficial to the city, also facilitated the project's hookup to another water main.

■ Our review of a council's legislative assessment decisions is very limited. The Council's decision is presumed correct. *City of Wasilla v. Wilsonoff,* 698 P.2d 656, 657 (Alaska 1985). We will reverse only upon a showing "of fraud or conduct so arbitrary as to be the equivalent of fraud,

more than a few people individual input at hearing not required by due process). *See generally United States v. Florida E.C. Ry.,* 410 U.S. 224, 244–45, 93 S.Ct. 810, 820–21, 35 L.Ed.2d 223 (1973) (discussing *Londoner* and *Bi–Metallic* ).

or so manifestly arbitrary and unreasonable as to be palpably unjust and oppressive." *Id.* at 658 (quoting *Kissane v. City of Anchorage,* 159 F.Supp. 733, 737 (D. Alaska 1958)). The complaining party bears the burden of proving the arbitrariness and injustice of the determination by producing competent evidence not "based on mere conjecture," including "objective documentation to support [their] assertions." *Wilsonoff,* 698 P.2d at 658.

The owners have not introduced competent evidence rebutting the presumption of correctness to which the council's determination is entitled. There was conflicting testimony at the hearing about who benefitted from the various improvements. The owners have not met their burden of proving fraud or manifest arbitrariness and unreasonableness.

## V.

The lot owners argue that the Council should be estopped from charging more than eight percent interest on the deferred assessment installments.

■ Estoppel may be asserted against a public agency. *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 97 (Alaska 1984) (building permit issued in violation of zoning ordinance; municipality estopped); *Jackson v. Kenai Peninsula Borough,* 733 P.2d 1038, 1040 (Alaska 1987) (same; city not estopped). The elements of equitable estoppel are:

(1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice. A fourth element ... is that the estoppel will be enforced only to the extent that justice so requires.... [T]his factor should play an important role when considering estoppel against a municipality. Often, even where reliance has been foreseeable, reasonable, and substantial, the interest of justice may not be served by

the application of estoppel because the public interest would be significantly prejudiced.

*Schneider,* 685 P.2d at 97 (citations omitted); *see also City of Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 48, 476 P.2d 423, 448 (1970) (Estoppel against the government is appropriate only where "the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.").

■ Elliott stated that Ketchikan Finance Director Al Learned assured him in October 1978 that the interest rate would be eight percent. Even if Learned made the alleged assurance to Elliott, we have little difficulty in concluding that this does not estop Ketchikan.[10] Elliott and Elberson appear to be sophisticated businessmen. We are thus not moved by the concerns we expressed in *Schneider,* 685 P.2d at 96–97, which involved an average citizen's good faith reliance upon an erroneously issued building permit. Northway advertised a payment term of fifteen years at eight percent interest. Some purchasers, including Mr. Enger, assumed this was a binding promise by the city. But Elliott does not allege that Learned promised a fifteen year term. Further, the advertisement does not mention that purchasers probably would have to refinance the lien with private lenders in order to get a construction loan. It is thus apparent that any statement Learned made to Elliott could easily have been distorted by Elliott and Elberson's "salesmanship" before reaching the lot owners' ears.

■ The city could not have promised any terms of payment at the time of the advertisement because they were not yet set. KMC 3.18.070 provides that the city council shall set rates and repayment schedules for assessments after the final

10. We assume for purposes of appeal that the facts asserted in the Elliott affidavit are true. Thus, we need not address the question whether the superior court erred in refusing to consider the affidavit on appeal.

Following the lot owners' second unsuccessful attempt to include the Elliott affidavit in the record on appeal, the superior court awarded Ketchikan actual attorney's fees for opposing the frivolous motion. The award of attorney's fees is affirmed.

assessment roll is completed.[11] This is not "an unsettled area of law" as in *Tetlin Native Corp. v. State,* 759 P.2d 528, 535 (Alaska 1988), where we found that the imposition of estoppel was necessary to prevent an unjust result.

The present case also is not analogous to *City of Kenai v. Filler,* 566 P.2d 670, 676 (Alaska 1977), where the city accepted the benefits of a contract and then sought to be released from the contract for its failure to comply with its own ordinances. Ketchikan has not accepted the benefit of any contract. Not only was there no contract here, but the benefit of the project has flowed almost entirely to the developer and the owners of the improved lots themselves. The benefit to Ketchikan from an increased tax base pales in comparison and lies largely in the future.

■ The owners' estoppel claim thus must depend on the ordinances which provided that bonds would be issued to finance the improvements. The owners' argument here is best summarized by Enger's statement at the January 22 hearing that the owners were willing to pay all of the costs of improvements, "but only ... at the interest rate set by law at the time these improvements were contractually required to be completed."

The Council never asserted that bonds would be issued at eight percent. The Ketchikan Municipal Code did limit such bonds to eight percent at the time of LID formation, at the time originally scheduled for completion, and at the time of substantial completion. However, the cap was removed by the time the project was fully completed, and that was the time that the assessment was made.

We believe that the only reasonable interpretation of the interest rate cap provision is that it applied only to those bonds *issued,* rather than authorized, when it was in effect. The rate cap provision dealt exclusively with the requirements for issuance of bonds and was inapplicable to any bonds other than those presently being issued pursuant to its terms. *See* former KMC 3.16.130, *quoted in supra* note 3.

The owners' argument reduces to the contention that the owners only should have to pay eight percent on their assessments while the taxpayers of Ketchikan subsidize the difference between eight percent and the market interest rate or the rate of any bonds issued. The record, however, is full of statements by council members that the city had no intention of subsidizing the owners of the benefitted lots. Moreover, the council refrained from issuing bonds in order to pass on to the owners the benefit of any future decreases in market interest rates.

■ The fourth element of estoppel allows enforcement only to the extent justice requires. Because of the importance of this element in cases against the government, we are not inclined to find estoppel at all. It would be unjust to force the population at large to subsidize the purchasers of Ketchikan's "most exclusive" lots as a result of an ambiguous assertion by a city council which had repeatedly expressed the opposite intent. *See generally Earthmovers of Fairbanks v. State, Dept. of Transp. and Pub. Facilities,* 765 P.2d 1360, 1370–71 (Alaska 1988). We thus find no merit in the estoppel claim.[12]

11. At the public hearing, the owners argued that since the project was substantially completed in October 1980, when the eight percent rate cap was still in effect, they should be charged interest at eight percent. The project was not fully completed until August 1981. It is only when the project is fully completed that the Council can determine the total cost and make an assessment. Since the rate cap was repealed by August 1981, the date of "substantial completion" is not relevant in determining whether the city is estopped from charging thirteen percent interest.

12. We also find no merit in the argument that the Council's action effected an "ex post facto" increase in the owners' obligations. The owners had no vested right to eight percent financing of their assessments. The record is devoid of support for the assertion that at the time the LID was approved and construction began "there was no foresight possible that the interest rate in effect could or would be changed."

## VI.

 The owners argue that by raising the interest rate cap on bonds, the council caused an increase of more than twenty percent in the project's costs. This, it is urged, required notice to the owners and an opportunity to object pursuant to KMC 3.16.110(d).[13]

The code provision in question refers to "contract cost plus all other costs of improvement," but we do not think this reasonably can be construed to include interim or post-construction finance expenses. The relevant paragraph refers to "Construction by Contractor," not financing. The lot owners' contention that the rise in rates caused costs to rise by twenty percent is based on a comparison of the costs of eight percent financing and thirteen percent financing and the assumption that every owner will finance the entire balance over fifteen years.[14] This argument lacks merit. Not only are most owners likely to pay off

their assessments prior to building on their lots,[15] but the determination of the payment schedule is clearly allocated to the Council after completion of the project. We believe the statute was intended to be limited to actual and projected costs of construction, which are capable of fairly precise quantification. Subjecting the LID process to interruption on the basis of something as mercurial as market interest rates would prevent homeowners, contractors, and the city from being able to plan ahead with any reasonable degree of certainty. Moreover, the interpretation urged by the lot owners would place on the Council the risk that interest rates will rise during the course of construction. Once interest rates reached a point where total cost estimates increase by twenty percent, the owners might compel the Council to terminate the project and bear the total expense of the uncompleted improvements.

We thus conclude that KMC 3.16.110(d) was not triggered by the council's decision

**13.** KMC 3.16.110(d), Unanticipated costs, provides in full:

(1) Construction by Contractor or Contractors.

(A) When the improvements in any L.I.D. are to be acquired, constructed and installed by a contractor or contractors, and if it appears after consideration of the contract cost plus all other costs of improvements that the total costs of improvements will exceed the estimated cost as it appears on the approving resolution or ordinance, by twenty percent or more, then at least fifteen days before the notice to proceed is given the contractor or contractors the director of public works of the city shall give notice of such estimated increased cost by certificate mail to the owners of the lots, tracts and parcels of land within the district at their last known address, and shall also publish, on or before the same date, a similar notice at least once in a newspaper of general circulation in the city.

(B) Said mailed and published notice shall state the amount, and percentage, of total cost of the expected additional charges over the last complete estimated cost, and shall further state that unless written objections to the city's ordering the contractor or contractors to proceed are filed with the city clerk by the owners of property within the district bearing fifty percent or more of the estimated cost of the improvements to be paid from assessments within ten days from the date of the mailing and publishing of such notice, said contractor or contractors will be ordered to proceed, and that said estimate of costs as

increased shall be the cost of improvements until all actual costs after completion are known.

(C) In the event such written objections are so filed by the owners of property within the district bearing fifty percent or more of the estimated costs of the improvements to be paid from assessments, then no notice to proceed shall be given the contractor and further work on the project shall cease. The city shall bear the costs of the project to date of termination.

**14.** Their argument also rests on the faulty premise that by eliminating the interest cap in December 1980, the council set the rate at thirteen percent. This is not true. In December 1980, the Council merely eliminated the bond rate cap and provided that the rate would be set by the Council upon issuance of bonds. If interest rates had fallen in 1981, the total financing costs may not have risen by twenty percent.

**15.** The Highlands LID involved undeveloped property. Comments by the developer at the public hearing indicate that private lending institutions rarely lend against property without requiring the assessment lien to be paid off. Thus, virtually every owner who builds a house on his or her lot will pay off the city by borrowing from a private lender. The lender will include the lien amount in the construction loan and ultimately in the 10- to 30-year mortgage. The city will likely finance the assessment for the entire term only if the lot remains unimproved.

to remove the cap on bond interest or its decision after completion of the project to charge thirteen percent interest on deferred assessments.

The judgment of the superior court is AFFIRMED.