*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MATTHEW FINK, WILLIAM COMPTON, PATRICIA LEFEVRE, CORBETT MOTHE, CLARK C. RUSH, ELIZABETH MORGAN, NANNIE SCHLEUSNER, CHUCK SPINELLI, DIANE WILKE, JASON DORRIS, KARLA GRUMMAN, JAMES NIGH, and NICOLAS WIEDER, <br><br> Appellants, <br><br> v. <br><br> MUNICIPALITY OF ANCHORAGE, <br><br> Appellee. | Supreme Court No. S-16451 <br><br> Superior Court No. 3AN-15-06925 CI <br><br> O P I N I O N <br><br> No. 7258 – July 20, 2018 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: James N. Reeves, Holmes Weddle & Barcott, P.C., Anchorage, for Appellants. Robert P. Owens, Assistant Municipal Attorney, and William D. Falsey, Municipal Attorney, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I. INTRODUCTION

Owners of real property (Property Owners) appeal special assessments that the Anchorage Municipal Assembly levied on their lots to pay for recently constructed road, water, and sewer improvement projects benefiting the lots. The Property Owners claim that the special assessments improperly include nearly $1 million in costs from another municipal utility project unrelated to the improvements built for the benefit of their lots. They also claim that the special assessments exceed limits set by ordinance and that the assessed costs are disproportionate to the benefits provided by the improvements, violating municipal ordinance, charter, and state law.

We conclude that the Assembly's allocation of costs among these projects was supported by substantial evidence and that the ordinance limit the Property Owners rely on does not apply to these assessments. We also conclude that the Property Owners have not rebutted the presumption of correctness that attached to the Assembly's proportionality decisions. We therefore affirm the superior court's decision affirming the Assembly's special assessment determinations.

## II. FACTS AND PROCEEDINGS

The present appeal concerns lots located in an Anchorage residential neighborhood called Turnagain Heights. This neighborhood was destroyed by the 1964 earthquake and remained undeveloped decades later. In 2002 some Turnagain Heights lot owners petitioned the Municipality of Anchorage to establish road, water, and sewer improvement districts. The Municipality produced cost estimates for the projects, and a majority of the property owners in the proposed improvement districts approved the estimates. The Assembly consequently enacted ordinances in 2004 creating three special assessment districts: a road improvement district (RID), a water

improvement district (WID), and a sewer improvement district (referred to as a "lateral improvement district" or LID).[1]

The Municipality hired an engineering consulting firm to do the design work for the three projects. Based on a geotechnical analysis of the area, the firm recommended that subdrains be incorporated in the projects' designs to remove groundwater and ensure soil stability during seismic activity.[2] These subdrains were to be placed in "the sewer utility trenches[,] . . . the deepest utility trench[es] that [are] graded to drain." The proposed subdrainage system significantly increased the cost estimates for the RID, WID, and LID projects, and the Municipality issued revised estimates in 2006. A majority of the property owners in the improvement districts approved the revised estimates. The Assembly amended the 2004 ordinances accordingly.[3]

The Municipality consolidated the RID, WID, and LID projects with an unrelated project by the Anchorage Water and Wastewater Utility (AWWU) to replace Pump Station 10, an aging sewer pump station in the area that had needed to be replaced for years. The contract manager for the RID, WID, LID, and Pump Station 10 projects

---

[1]        Municipality of Anchorage, Ordinances 2004-2, 2004-19, 2004-20 (Apr. 20, 2004).

[2]        Each of the ordinances that established the improvement districts expressly required that "[t]he design of [the] public improvements . . . be routed through the Geotechnical Advisory Commission for review and recommendations." Ordinance 2004-2 § 8; Ordinance 2004-19 § 6; Ordinance 2004-20 § 6. The Commission approved the RID, WID, and LID projects. According to the minutes of a June 29, 2006 meeting between improvement district property owners and municipal officials, the Commission would likely not have approved the projects if the designs had not included a subdrainage system.

[3]        Municipality of Anchorage, Ordinances 2007-51, 2007-52, 2007-53 (Apr. 17, 2007).

characterized the Pump Station 10 project as "a basic infrastructure upgrade" that benefited users outside the improvement district area as well as within it. The Municipality believed consolidating the projects would "allow maximum cost and schedule efficiencies."

The Municipality created six work schedules for the consolidated projects, lettered A-F. Schedules A-C included all the work necessary for the Pump Station 10 project, as well as some work needed for the RID, WID, and LID projects. Schedules D-F included the balance of the work needed for the RID, WID, and LID projects. The Municipality invited contractors to submit a "base bid" comprising work identified in Schedules A-C and bid on "deductive alternates" comprising work identified in Schedules D-F. The Municipality divided the work and solicited bids in this manner so that the Pump Station 10 project could go forward without the improvement district projects in the event that none of the bids was compatible with the cost estimates that the district property owners had approved.

The Municipality received an acceptable bid for the entire contract (Schedules A-F), and all four projects were built. In November 2011 the Municipality submitted proposed resolutions to the Assembly to levy special assessments on the improvement district properties to pay for the completed work. The Assembly held a two-day public hearing, and in February 2012 it issued resolutions levying the assessments.[4] The RID, WID, and LID assessments included not only costs from Schedules D-F but also some costs from Schedules A-C.

Some affected property owners — including most of the Property Owners in the present appeal — were unsatisfied with the assessments and the process afforded

---

[4]     Municipality of Anchorage, Resolutions 2011-321, 2011-322, 2011-323 (Feb. 28, 2012).

them by the Assembly; they filed an appeal in superior court. The superior court remanded the matter to the Assembly, ruling that the Assembly needed to conduct an adjudicatory hearing and decide disputed issues of fact in accordance with Anchorage Municipal Code (AMC) Chapter 3.60.[5]

A panel composed of three Assembly members conducted such a hearing over three days in December 2014. Following the hearing, the panel issued findings of fact and conclusions of law rejecting most of the aggrieved property owners' objections to the assessments.[6] The Assembly approved the hearing panel's findings of fact and conclusions of law and issued new resolutions confirming and levying assessments on the improvement district property owners.[7]

A group of property owners — the Property Owners — remained unsatisfied and filed a renewed appeal in superior court. The Property Owners argued, among other things, that "[a]ll items of work set forth on Schedules A-C were necessary components of [Pump Station] 10" and that it was thus "improper and unlawful [for the Assembly] to pass those costs to the improvement districts." The Property Owners also argued the assessments exceeded "120% of contract construction costs," in violation of AMC 19.30.040(A)(1). And they argued the special assessments were not proportional

---

[5]     *Fink v. Municipality of Anchorage*, No. 3AN-12-06917 CI (Alaska Super., Sept. 6, 2013). Chapter 3.60 sets out procedures to be followed in "quasi-judicial proceedings and administrative hearings."

[6]     The hearing panel found that two properties in the improvement districts received no net benefit from the improvements. *See infra* note 44. The hearing panel otherwise rejected all challenges to the assessments.

[7]     Municipality of Anchorage, Resolutions 2014-193, 2014-194, 2014-195 (Apr. 14, 2015).

to the benefit conferred by the improvements. The superior court rejected all arguments; the Property Owners appeal to this court.

## III. STANDARD OF REVIEW

We review a municipal assembly's decision directly.[8] We apply the substantial evidence standard of review to the assembly's findings of fact.[9] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[10]

Interpretation of an ordinance or municipal charter provision presents a question of law.[11] We generally review such questions using our independent judgment, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[12] But "when reviewing questions of law that involve the [Assembly's] expertise . . . [or] fundamental policy determinations," we apply the rational basis standard, deferring "to the [Assembly's] determination as long as it is supported by the facts and has a reasonable basis in law."[13]

---

[8] *Luper v. City of Wasilla*, 215 P.3d 342, 345 (Alaska 2009); *Miller v. Matanuska-Susitna Borough*, 54 P.3d 285, 288 (Alaska 2002).

[9] *S. Anchorage Concerned Coal., Inc. v. Municipality of Anchorage Bd. of Adjustment*, 172 P.3d 774, 780 (Alaska 2007).

[10] *Id.* (quoting *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006)).

[11] *See Cent. Recycling Servs., Inc. v. Municipality of Anchorage*, 389 P.3d 54, 57 (Alaska 2017); *Municipality of Anchorage v. Repasky*, 34 P.3d 302, 305 (Alaska 2001).

[12] *Alaska Miners Ass'n v. Holman*, 397 P.3d 312, 315 (Alaska 2017) (quoting *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 279 (Alaska 2015)).

[13] *Miller*, 54 P.3d at 288-89.

Our review of a municipal assembly's special assessment decision is also constrained by the "presumption of correctness."[14] This presumption attaches whenever a municipal assembly acting in its legislative capacity levies special assessments.[15] When the presumption has attached, we will reverse the assembly's decision "only upon proof of 'fraud or conduct so arbitrary as to be the equivalent of fraud, or [where a decision is] so manifestly arbitrary and unreasonable as to be palpably unjust and oppressive.' "[16]

## IV. DISCUSSION

### A. Allocation Of Costs Between The Improvement Districts And The Pump Station 10 Project

The Property Owners first claim that the Municipality improperly "shifted" about $1 million in costs from the installation of a subsurface drainage system needed by Pump Station 10 to the RID, WID, and LID projects. As a result, the Property Owners argue, "a small group of property owners" has been forced to "hold[] the bag for" expenses related to AWWU's maintenance of its sewer system — expenses that ordinarily would have been passed on to the utility's systemwide customer base.

#### 1. Additional background

As explained above, the Municipality divided the construction work for the RID, WID, LID, and Pump Station 10 projects into six different schedules: Schedules A-F. Schedules D-F included work necessary for the RID, WID, and LID projects but

---

[14] *Prop. Owners Ass'n of the Highland Subdivision v. City of Ketchikan*, 781 P.2d 567, 572-73 (Alaska 1989).

[15] *Id.*

[16] *Weber v. Kenai Peninsula Borough*, 990 P.2d 611, 614 (Alaska 1999) (alteration in original) (quoting *City of Wasilla v. Wilsonoff*, 698 P.2d 656, 658 (Alaska 1985)).

not for the Pump Station 10 project.  The Municipality charged the expenses associated with Schedules D-F to the improvement districts and included them in the special assessments.

Schedules A-C included all the work needed for the Pump Station 10 project and some work needed for the RID, WID, and LID projects.  The Municipality charged nearly $1 million in expenses associated with Schedules A-C to the improvement districts and thus included them in the special assessments.[17]  A significant portion of this nearly $1 million — namely, $834,542 from Schedule B — resulted from construction of a subdrainage system.[18]  As explained above, the firm that designed the RID, WID, and LID projects recommended construction of this subdrainage system in order to remove groundwater and make the soil more stable in the event of an earthquake.  Ensuring stability was essential because it was expected that the improvement districts would be developed for residential use.

Pump Station 10 also needed the subdrainage system.  But the Assembly hearing panel heard testimony that a subdrainage system that served only Pump Station 10 would have been more limited than the shared system actually constructed.  The projects' contract manager explained that "maintaining the stability" of the

---

[17]     Specifically, for Schedule A, the Municipality charged $94,998 to the LID and $3,223,269 to Pump Station 10.  For Schedule B, the Municipality charged $834,542 to the RID and $56,760 to Pump Station 10.  And for Schedule C, the Municipality charged $60,821 to the WID and $159,329 to Pump Station 10.

[18]     The rest of the nearly $1 million resulted from construction of sewer and water lines shared by the improvement districts and Pump Station 10. *See supra* note 17. The Property Owners do not specifically argue that these expenses were improperly shifted to the improvement districts.  Such an argument would lack merit in any case. Substantial evidence in the Assembly hearing record supports a conclusion that the improvement district properties benefited significantly from the sewer and water lines and were charged only a fraction of the cost for these lines.

improvement districts was "more important than dewatering the pump station." The primary author of the geotechnical report for the projects further explained, "If a pump station slides down the hill, the consequences are far less than a lot of houses." The Municipality charged the vast majority of the expenses associated with constructing the subdrainage system to the RID project.

The hearing panel heard testimony on the accounting practices used to ensure that costs were properly allocated among the projects. In particular, AWWU's capital program manager testified that expenses for the different projects were "tracked separately" and that multiple individuals reviewed the pertinent records as the projects progressed. A project administrator acknowledged discrepancies of around $10,000 total in the accounting records. She testified that the errors had been corrected and that "the total project costs that were calculated and allocated [were] accurate."

The Assembly hearing panel found that the subdrainage system was "necessary" for the improvement district projects. The panel found that the Municipality "properly shifted approximately $1 million . . . back into the Special Improvement Districts so that [they] would pay for that part of the construction work essential to and directly benefiting the Improvement Districts." And the panel found that the Municipality "used proper accounting procedures to separately track the costs of each project individually, and that none of the costs for [Pump Station] 10 were improperly assessed against the property owner taxpayers." The Assembly approved these findings.

2.    Analysis

In arguing that the Municipality erroneously shifted about $1 million from the Pump Station 10 project to the improvement district projects, the Property Owners rely on Anchorage Municipal Charter section 9.02(e). This provision states: "An account or accounts for each special assessment district shall be created and kept separate

from all other municipal accounts. Revenues collected within a special assessment district may be applied only to costs incurred with respect to that assessment district."

The Property Owners fail to show that the Municipality violated this provision. The Assembly hearing panel's findings set forth above establish that the Municipality complied with section 9.02(e) by maintaining separate accounts. The findings also establish that the Assembly complied with section 9.02(e) because the special assessments did not include any costs other than those "incurred with respect to the assessment district[s]." The Property Owners do not challenge these findings, let alone show that they are not supported by substantial evidence.[19]

The Property Owners point to hearing panel testimony by an "engineer engaged by AWWU and the [Municipality] . . . that all of the items on Schedules A, B and C were necessary for Pump Station 10, regardless of whether the Improvement District[s] were built." But the Property Owners ignore contrary testimony that the subdrainage system included in Schedule B would have been more limited had the improvement districts not been built. In any case, the fact that items in Schedules A-C were required by the Pump Station 10 project is consistent with these items also being required by the RID, WID, and LID projects. Or to use the language of section 9.02(e), the mere fact that costs were "incurred with respect" to the Pump Station 10 project does not mean that the same costs were not also "incurred with respect to the assessment district[s]."

---

[19] The superior court required the Assembly hearing panel to decide this issue using the adjudicatory procedures of AMC Chapter 3.60. The Municipality does not appeal this interim ruling. We thus assume, without deciding, that the Municipality's characterization of these costs is a factual issue and that we should affirm the Assembly on this issue only if its determination is supported by substantial evidence.

In the alternative, the Property Owners argue that even if the subdrainage system benefited the improvement district properties in addition to Pump Station 10, the Municipality failed to " 'fairly allocate' the costs" and improperly "forc[ed] the [improvement district properties] to pay for the entirety of them." However, the Property Owners do not cite any authority other than section 9.02(e). This provision does not impose a "fair allocation" requirement over and above its requirements that expenses be properly segregated and accounted for and that assessments "be applied only to costs incurred with respect to th[e] assessment district." To the extent the Charter and other sources of law do not fully dictate how expenses should be divided once the requirements of section 9.02(e) are satisfied — as they are in this case — such division is a policy matter that is legislative in nature. The Assembly may accordingly exercise its discretion in dividing the expenses within the bounds of the controlling law.[20]

If the Property Owners could show that the Municipality or Assembly acted arbitrarily or with bias or malice in dividing the costs — and thus rebut the presumption of correctness — then perhaps it would be appropriate for this court to intervene. But the Property Owners fail to do so. We thus reject the Property Owners' claim that the Municipality did not properly divide the expenses among the RID, WID, LID, and Pump Station 10 projects.

## B.     AMC 19.30.040(A)(1) Assessment Limit

The Property Owners next claim that the special assessments levied by the

---

[20]     *See* 14 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 38:61, at 287 (3d ed. 2008) ("In the establishment of improvement districts and levying assessments on property benefited, within the restrictions of the applicable law, broad discretion is vested in the municipal authorities.").

Assembly violate AMC 19.30.040(A)(1).[21] AMC 19.30.040(A) states:

> *Generally.* Except as provided in subsection B of this section or elsewhere in this title, the project costs assessed against benefited parcels shall be the least of the following:
>
> 1. Construction contract costs plus 20 percent for noncontract costs, including but not limited to engineering and design, surveys, soil investigations, right-of-way negotiations, inspection and contract supervision, and net interest, plus actual property acquisition costs;
>
> 2. The last approved estimate plus ten percent; or
>
> 3. The total cost of the improvement less the amount of any grant the municipality uses to defray the cost of the project.

The Property Owners argue that the special assessments exceed the cap in subsection .040(A)(1) because the assessed project costs exceed the "construction contract costs" of the RID, WID, and LID projects by more than 20 percent. For instance, the Property Owners assert that the construction contract costs for the RID project were $2,371,707.[22] Yet in calculating the RID assessments, the Municipality used an adjusted project cost of $4,860,838, a figure which far exceeds 120% of the

---

[21] The Municipality argues that we should apply the rational basis standard on this issue because the interpretation of this ordinance involves the Assembly's special expertise. But because we reach the same result when we apply the independent judgment standard advocated by the Property Owners, we do not need to decide which is appropriate. *See Cent. Recycling Servs., Inc. v. Municipality of Anchorage*, 389 P.3d 54, 57 (Alaska 2017).

[22] The Property Owners do not include expenses associated with Schedule B in this figure. If these expenses are included — as they should be, *see supra* Part IV.A — then the construction costs come to $3,206,249.

construction contract costs.[23]  Similar discrepancies between the construction cost and the assessed project cost purportedly exist for the WID and LID projects.

The Property Owners' claim that the assessments violate the subsection .040(A)(1) cap is undermined by the exception clause at the beginning of subsection .040(A).  By its express terms, the caps in subsection .040(A) apply "[e]xcept as provided . . . elsewhere in" AMC Title 19.  Because there are provisions elsewhere in AMC Title 19 that independently determine the assessable project costs for road, water, and sewer improvements, the subsection .040(A) caps do not apply.

First, AMC 19.40.100(A), which governs assessments for "upgrade" road improvement districts like the RID in this case,[24] provides that "[a]ssessable costs for upgrade RIDs shall be seventy percent (70%) of the total project costs."  The term "total project costs" is defined in AMC 19.40.010 as "all costs, direct and indirect, incurred during development of the project."  Moreover, AMC 19.30.030(A) provides:

> The costs of an improvement or service shall be its actual cost including acquisition of real property and interests therein, appraisal, design, engineering, and surveying for an improvement, and administration, overhead, collections, legal and other professional services, net interest (interest paid less interest earned)[,] anticipated reserve or guarantee fund costs, the cost of notice, and all other costs resulting from the formation of the district and the construction of the improvement or providing the service, including costs described in [AMC] 19.30.040 and 19.30.080.

---

[23]     This $4,860,938 figure, which is below the $4,898,550 total project cost, is equal to 110% of the cost estimate approved by the district property owners.  *See* AMC 19.40.130.  The RID properties were assessed only about half of the $4,860,938 amount for the RID portion of the improvements.  *See infra* note 36 and accompanying text.

[24]     The Assembly treated the road improvements in this case as upgrade road improvements.

Together, these three provisions define the "assessable costs" for upgrade road improvements as 70% of the total actual costs of the improvement, including construction expenses and all other direct and indirect expenses. This definition overrides subsection .040(A)'s definition of "project costs assessed." The 120% cap in subsection .040(A)(1) thus does not apply to the RID in this case.[25]

Next, assessments for water improvements are governed by AMC 19.55.010. This ordinance provides that "[t]he cost of capital improvements to provide water service shall be allocated in the manner and according to the criteria provided in the approved tariff of the municipal water utility." The water utility tariff in effect during the relevant time period states that "[t]he assessed project cost shall equal the total cost of the water main improvement less the amount of any funds contributed to defray the cost of the improvement."[26] The tariff's definition of "assessed project

---

[25] Furthermore, the Assembly enacted subsection .040(A)'s exception clause and AMC 19.40.100, the provision for calculating RID assessments, in the same ordinance. *See* Municipality of Anchorage, Ordinance 2002-186 (Jan. 28, 2003). The Mayor's assembly memorandum accompanying this ordinance states that the purpose of subsection .040(A)'s exception clause is to "allow the assessment cost issues related to street improvements to be addressed in the code section related to street improvement." Mayor, Municipality of Anchorage Assembly Memorandum 2002-1067, at 2 (Dec. 17, 2002). The Mayor's contemporaneous interpretation of subsection .040(A)'s exception clause provides additional support for our conclusion that the subsection .040(A)(1) cap does not apply to the RID in this case. *See Cent. Recycling Servs.*, 389 P.3d at 57 (explaining that in interpreting an ordinance, as in interpreting a statute, we consider the ordinance's language and legislative history); *Flisock v. State, Div. of Ret. & Benefits*, 818 P.2d 640, 645 (Alaska 1991) ("The interpretation of legislation by . . . the agency that sponsored the bill is entitled to be given weight by the court in construing the intent of the statute.").

[26] Anchorage Water Utility, Tariff for Water Service, Regulatory Comm'n of Alaska Certificate No. 122, Sheet No. 118 (Apr. 12, 2010). The Municipality provided the Assembly hearing panel with a copy of this tariff. The Property Owners do not

(continued...)

cost" clearly overrides subsection .040(A)'s definition of "project costs assessed." And by defining the "assessed project cost" as the "total cost of the water main improvement," the tariff tracks the expansive "costs of an improvement" language in AMC 19.30.030(A), not the more limited concept of "construction contract costs" in subsection .040(A)(1). Thus, AMC 19.30.030(A), AMC 19.55.010, and the applicable tariff together provide for the assessment of the total actual costs of the water improvement. The cap in subsection .040(A)(1) does not apply to the WID assessment in this case.[27]

Finally, AMC 19.70.010 governs assessments for sewer improvements. Identical in form to AMC 19.55.010, discussed in the preceding paragraph, AMC 19.70.010 states that "[t]he cost of capital improvements to provide sewer service shall be allocated in the manner and according to the criteria provided in the approved tariff of the municipal sewer utility." The pertinent sewer tariff states that "[t]he assessed project cost shall equal the total cost of the improvement less the amount of any grant that the Utility uses to defray the cost of the improvement."[28] Like the water tariff, this sewer tariff supplants subsection .040(A) for improvements within its scope and provides

---

[26]    (...continued)
dispute that this is the applicable tariff, and we therefore assume that this is the case.

[27]    AMC 19.30.090 reinforces our conclusion that the subsection .040(A)(1) cap does not apply to the WID assessment in this case. This provision supplements subsection .040(A)'s exception clause, stating: "This chapter" — which includes subsection .040(A) — "does not apply to water improvements constructed pursuant to tariffs filed with the state public utilities commission by the municipal water utility."

[28]    Anchorage Wastewater Utility, Tariff for Wastewater Service, Regulatory Comm'n of Alaska Certificate No. 126, Sheet No. 84 (July 29, 2010). The Municipality provided a copy of this tariff to the Assembly hearing panel, and the Property Owners do not dispute that this is the applicable tariff. *See also supra* note 26.

for the assessment of the total actual costs of the improvement. The cap in subsection .040(A)(1) therefore does not apply to the LID assessment.

The Property Owners advance several arguments against interpreting AMC 19.40.100(A), 19.55.010, and 19.70.010 as overriding the subsection .040(A) caps. None is persuasive.

The Property Owners first contend that subsection .040(A) "determin[es] the amount that can be recovered by assessing the properties" and that AMC 19.40.100(A), 19.55.010, and 19.70.010 merely "determin[e] how that amount is to be allocated among the properties in the improvement district." In support of this argument, the Property Owners note that the title of AMC Chapter 19.30 is "*Calculation* of Improvement Costs" and that the title of AMC Chapter 19.40 is "*Allocation* of Street Improvement Costs." (Emphases added.) They also point out that AMC 19.55.010 and 19.70.010 expressly refer to "allocat[ion]" — not "calculation" — of costs.

Even if the words "allocation" and "calculation" are read in contradistinction as suggested by the Property Owners, it does not follow that assessments under AMC 19.40.100(A), 19.55.010, and 19.70.010 are subject to the cap in subsection .040(A)(1). AMC 19.40.100(A) expressly states that "[a]ssessable costs for upgrade RIDs shall be seventy percent (70%) of the *total project costs*." (Emphasis added.) Similarly, the tariffs invoked by AMC 19.55.010 and 19.70.010 provide that the "assessed project cost shall equal the *total cost of the improvement*."[29] Accordingly, the quantity allocated is the "total project costs" or the "total cost of the improvement," not the capped "[c]ontract construction costs plus 20 percent" amount in subsection .040(A)(1).

---

[29]     Tariff for Wastewater Service, Sheet No. 84 (emphasis added); *see also* Tariff for Water Service, Sheet No. 118.

The Property Owners next argue that the subsection .040(A)(1) cap is needed to protect the interests of property owners who oppose a special assessment. Under Anchorage ordinance, a special assessment district "may be created or extended . . . with the approval of the property owners who would bear more than 50 percent of the estimated cost."[30]  Both the owners who supported and those who opposed the assessment district are assessed when the project is completed.[31]  The Property Owners assert that owners who supported the assessment are protected from ballooning project costs by ordinances that limit assessable costs to 110% of the cost estimate approved by these property owners.[32]  So long as the assessed costs are within this limit, the approving owners arguably have a weak basis to complain even if the assessed costs are inflated by excessive design, administrative, and other non-construction expenses.  The dissenting property owners, however, did not approve the cost estimate.  If these owners complain of excessive non-construction costs, it is no answer to them to say that the costs are consistent with (or no more than 110% of) the approved estimate.  Thus, the Property Owners argue, subsection .040(A)(1)'s cap of 120% of the construction contract costs is needed to protect the dissenting property owners from inflated non-construction costs.

The problem with the Property Owners' policy argument is that the exception clause in subsection .040(A) shows that the Assembly anticipated that the subsection .040(A)(1) cap would not apply in all cases.  It therefore does not appear that the Assembly viewed subsection .040(A)(1)'s cap of 120% of the construction contract

---

[30]     AMC 19.20.010(B).

[31]     *See* AMC 19.20.190 ("The assembly may assess for an improvement or service any real property or interest in real property specially benefitted and such property may include abutting, adjoining, adjacent, contiguous, non-contiguous or other property specially benefitted directly or indirectly by the improvement . . . .").

[32]     *See* AMC 19.30.040(A)(2), 19.40.130.

costs as essential protection for property owners who oppose a special assessment. In the absence of any indication that the policy advanced by the Property Owners was in fact the Assembly's — the legislature's — policy, we follow the plain language of the pertinent ordinances.[33] And as explained above, this language indicates that the RID, WID, and LID assessments in this case are not subject to the subsection .040(A)(1) cap.

The Property Owners' final argument is that if AMC 19.40.100(A), 19.55.010, and 19.70.010 "trump the '120%-of-contract-construction-costs' limit" of subsection .040(A)(1), this limit will "never apply to any road, water [or] sewer project" and "[t]he alleged exceptions . . . [thus] nearly swallow the rule." This, the Property Owners argue, violates the "general rule" of statutory interpretation that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[34]

This argument lacks merit. We do not apply the presumption against superfluity "mechanistically" or in such a manner as to defeat the intent of the legislature.[35] Here, the text of AMC 19.40.100(A), 19.55.010, and 19.70.010 clearly favors reading these provisions as overriding subsection .040(A)(1) for assessment districts within their scope. Moreover, AMC 19.40.100(A), 19.55.010, and 19.70.010 do not "swallow the rule." The Municipality's counsel provided several examples during

---

[33]     *See Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1043-44 (Alaska 1992); *see also Attorneys Liab. Prot. Soc'y, Inc., v. Ingaldson Fitzgerald, P.C.*, 370 P.3d 1101, 1105 (Alaska 2016) ("We 'use a sliding scale approach to statutory interpretation, in which "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be." ' " (quoting *Municipality of Anchorage v. Stenseth*, 361 P.3d 898, 905 (Alaska 2015))).

[34]     *Homer Elec. Ass'n*, 841 P.2d at 1045 (quoting *Alascom, Inc. v. N. Slope Borough, Bd. of Equalization*, 659 P.2d 1175, 1178 n.5 (Alaska 1983)).

[35]     *Id.* at 1045-46.

oral argument of improvement districts that do not fall within those three ordinances and thus are subject to the subsection .040(A)(1) cap: extension of a gas line, construction of a parking facility, and construction of drainage facilities.

We therefore reject the Property Owners' claim that the Assembly violated AMC 19.30.040(A)(1) by failing to cap the RID, WID, and LID assessments at 120% of the construction contract costs.

## C. Proportionality Between Costs Assessed And Benefit Conferred

The Property Owners claim that some of the special assessments levied are illegal because they "exceed the value that [the improvements] add[ed] to the propert[ies]." They contend that the assessments on certain properties in the improvement districts "exceed[] . . . the value of the benefit . . . , as measured by . . . change in market value, by approximately 400%."

### 1. Additional background

In determining the assessments to be levied on the improvement district lots, the Assembly applied provisions in the Anchorage Municipal Code for apportioning road, water, and sewer special assessments. For the RID, the Assembly apportioned $2,538,137 (representing the total RID project cost of $4,898,550 minus the "Municipal Contribution")[36] among the properties based on "parcel access, parcel area, and parcel frontage," in accordance with the formula in AMC 19.40.090.[37]

---

[36]    Mayor, Municipality of Anchorage Assembly Memorandum 2014-411 (Apr. 14, 2014) (detailing the calculations that produced the assessment amounts approved in Municipality of Anchorage, Resolution 2014-193 (Apr. 14, 2015)). The Municipal Contribution included deductions required by AMC 19.40.100(A) and 19.40.130, assessments for properties owned by the Municipality, and various other "equitable adjustment[s]." *Id.* at 2.

[37]    Municipality of Anchorage, Ordinance 2004-2 § 5 (Apr. 20, 2004).

The Assembly apportioned the WID assessment according to the "equal assessment methodology as delineated in the Anchorage Water Utility Tariff."[38] The equal assessment methodology is one of two methods set forth in the water utility tariff for distributing a special assessment[39] and was the method selected by the district property owners who approved the WID.[40] In accordance with this method, each lot in the WID was assessed an amount equal to the total assessed project cost of $1,030,741 divided by the total number of lots.[41]

The Assembly likewise apportioned the LID assessment (totaling $1,326,810) according to the sewer utility tariff's equal assessment methodology.[42] The

---

[38] Municipality of Anchorage, Ordinance 2007-51 § 3 (Apr. 17, 2007).

[39] Anchorage Water Utility, Tariff for Water Service, Regulatory Comm'n of Alaska Certificate No. 122, Sheet No. 118 (Apr. 12, 2010).

[40] *See* Municipality of Anchorage, Ordinance 2004-19 ¶ E (Apr. 20, 2004); Mayor, Municipality of Anchorage Assembly Memorandum 2004-55 (Jan. 20, 2004).

[41] Tariff for Water Service, Sheet No. 118. To be entirely accurate, each lot was assessed an equal "mainline charge" of $29,554, but the lots' "service connect" charges were not all identical: Two lots' charges were $2,000, others' were $3,000, and those for lots owned by the Municipality were $0. Municipality of Anchorage, Resolution 2014-194 Exh. A (Apr. 14, 2015).

[42] All lots were charged an equal "lateral mainline charge" of $43,062, and all but the Municipality-owned lots were charged a $3,000 "lateral service connect" charge. *See* Municipality of Anchorage, Resolution 2014-195 Exh. A (Apr. 14, 2015); Municipality of Anchorage, Ordinance 2007-52 § 3 (Apr. 17, 2007); *see also* Anchorage Wastewater Utility, Tariff for Wastewater Service, Regulatory Comm'n of Alaska Certificate No. 126, Sheet No. 85 (July 29, 2010).

district property owners who approved the LID selected this method over the alternative provided for in the tariff.[43]

Various district property owners (including most of the Property Owners in this appeal) argued to the Assembly hearing panel that some of the assessments calculated in the manner just described are illegal because they "exceed[] the benefit that [the improvements] confer[] upon the propert[ies]." They contended (and the Property Owners continue to contend) that the assessment imposed on a lot should not exceed the amount by which the lot increased in value as a result of the improvement.

The Assembly hearing panel discussed this issue in its findings of fact and conclusions of law and ultimately rejected the argument for all but two properties. The panel first noted that "the annual [property tax] assessments for the vast majority of the properties affected by the Improvement Districts ha[d] risen since the improvement districts [had been] completed." The panel cited two examples. First, "one of the low-end lots[] was assessed at $34,800.00 in 2007; $36,600.00 in 2008; $36,600 in 2009; $80,200.00 in 2010; $97,800.00 in 2011; $94,200.00 in 2012; and $94,000.00 in both 2013 and 2014." Second, "a higher-end lot . . . was assessed at $71,600.00 in 2007; $60,200.00 in 2008; $60,200.00 in 2009; $237,600.00 in 2010; $246,600 in 2011; $246,600.00 in 2012, 2013 and 2014."

The hearing panel next examined the "sale activities of some of the lots in question following completion of the improvements." In December 2012 a lot "assessed at approximately $60,000.00 before the Special Improvements were built . . . sold for $200,000.00 with the buyer assuming the assessments 'for any and all subdivision improvements (LID/RID/WID).' " Similarly, in an April 2014 sale, the buyer assumed

---

[43] Municipality of Anchorage, Ordinance 2004-20 ¶ E (Apr. 20, 2004); Mayor, Municipality of Anchorage Assembly Memorandum 2004-56 (Jan. 20, 2004).

"the obligation of the Special Assessments as part of the sale — 'regardless of the final assessment value.' " In other sales the buyer likewise agreed to "assume[] liability to pay for the assessments associated with the lot." The panel found these sales were "evidence that most properties received substantial benefit in the form of an increase in fair market value."

Next, the hearing panel noted that two district property owners — both of whom are parties to this appeal — acknowledged in their testimony that they had received some benefit from the improvement districts. The panel also found that "with [one] exception . . . , no [property owners] submitted any evidence . . . sufficient to show that their property values decreased as a result of the construction of the Special Improvements." The panel concluded that "with the exception of [two] properties[,] . . . the assessments do not exceed the value conferred upon the lot owners."[44] The Assembly approved these findings.

### 2.    Analysis

In arguing that certain assessments exceed the benefits from the projects and are thus illegal, the Property Owners rely on two municipal provisions setting forth a "proportiona[lity]" requirement. First, Anchorage Municipal Charter section 9.02(a) provides that an "assessment or levy shall be proportionate to the benefit received from and the burden imposed upon the improvement." Second, AMC 19.20.010(A) states that

---

[44]    The Assembly hearing panel made a number of findings on the two properties that did not benefit, one of which purportedly decreased in value. The Municipality had erroneously included these two properties in the improvement districts even though the properties had already been "fully developed with water, sewer, road access and homes built on the lots." The Municipality had previously provided an equitable adjustment for one of the two properties, and the panel recommended that the Municipality provide an equitable adjustment for the other property. Ultimately, an adjustment was provided.

"[a]s required by the Charter, assessments for capital improvements . . . within an assessment district shall be proportionate to the benefit received from and the burden imposed upon the improvement."[45]

When a municipal assembly, acting in its legislative capacity, chooses and applies a method for ensuring proportionality, a presumption of correctness attaches to its proportionality determination.[46] This presumption "places a heavy burden of proof" on a party challenging the determination.[47] Such a party must show "gross[] disproportiona[lity]"[48] or otherwise show that the determination was the product of fraud or "so manifestly arbitrary and unreasonable as to be palpably unjust and oppressive."[49]

We conclude that the Property Owners have failed to show that the assessments were disproportionate. First, it is clear that the Assembly chose and applied methods for calculating proportionality. It apportioned the RID assessment in accordance with AMC 19.40.090, which expressly states that its "intent . . . is to establish a method for determining an assessment share for each parcel that is proportionate to the

---

[45]     The Property Owners also cite AS 29.46.060(a), which states that "[t]he governing body shall assess the authorized percentage of the cost against property in the [special assessment] district . . . in proportion to the benefit received." As the Municipality points out, this statute does not apply because the Assembly has exercised the authority granted under AS 29.46.020 to adopt ordinances governing the special assessment process — namely, the ordinances codified at AMC Title 19. *See* AS 29.46.020(c); *Miller v. Matanuska-Susitna Borough*, 54 P.3d 285, 290 (Alaska 2002).

[46]     *See Weber v. Kenai Peninsula Borough*, 990 P.2d 611, 614 (Alaska 1999) ("We presume that a municipal legislative assessment decision is valid.").

[47]     *City of Wasilla v. Wilsonoff*, 698 P.2d 656, 658 (Alaska 1985).

[48]     *Miller*, 54 P.3d at 290.

[49]     *Weber*, 990 P.2d at 614 (quoting *Wilsonoff*, 698 P.2d at 658).

benefit received."[50]  The Assembly apportioned the LID and WID assessments in accordance with the equal assessment methodology set forth in the water and sewer tariffs.  Pursuant to AMC 19.55.010 and 19.70.010, the Assembly was required to comply with the tariffs.  The district property owners who approved the improvement districts chose the equal assessment methodology over an alternative method set forth in the tariffs, and we have previously approved the use of this methodology.[51]

The Assembly next concluded that under the chosen methodologies, the total costs assessed against the improvement district properties did not exceed the total benefits conferred on those properties.  Evidence and findings in the Assembly hearing record support this assertion.  The hearing panel considered two representative properties

---

[50]  AMC 19.40.090 provides for assessment based on "parcel access," "parcel area," and "parcel frontage."  The assembly memorandum for the ordinance that enacted AMC 19.40.090 explains why the Municipality believed consideration of these three factors would provide for an equitable division of road and street special assessments:

> Parcel access:  Improved parcel access to the public roadway system is considered the primary benefit of a street improvement . . . .

> Parcel area:  Increased property value and enhanced land use are considered the next significant benefits of street improvements. Parcel area is a practical method of allocating these benefits since both property value and land use are functions of the parcel size. . . .

> Parcel frontage:  Improved parking and direct access to a parcel is another benefit of street improvements.  Parcel frontage is the most practical method of allocating these benefits.

Mayor, Municipality of Anchorage Assembly Memorandum 2002-1067, at 3 (Dec. 17, 2002) (proposing Municipality of Anchorage, Ordinance 2002-186 (Jan. 28, 2003)).

[51]  *See Miller*, 54 P.3d at 289-92.

(a "low-end" lot and a "higher-end" lot) and found that they had substantially increased in value as a result of improvements. The panel also examined evidence of property sales in the improvement districts. This evidence showed that properties had been sold at prices higher than their pre-improvement values and with the buyer assuming responsibility for paying the assessments. Finally, the panel considered affected property owners' testimony to the effect that they had benefited from the improvements. Based on this evidence, the Assembly hearing panel found that "property values have increased substantially with the completed Special Improvement District construction." This general finding, adopted by the whole Assembly, is legislative, rather than adjudicative, in character because it pertains to a large group of taxpayers in the aggregate.[52]

In sum, the Assembly divided the assessments among the properties in accordance with methods required by ordinance and tariff, and it made a legislative determination that the assessments and benefits were proportionate. A presumption of correctness accordingly attaches to the assessments imposed on the improvement district properties.

The Property Owners fail to overcome this presumption. They do not dispute that the total costs assessed against the improvement district properties do not substantially exceed the total benefits conferred on those properties. Instead, they argue that consideration of proportionality in aggregate was not sufficient because the Assembly was required to make "a separate comparison of cost to benefit for each lot on a stand-alone basis" to discharge the proportionality requirements in AMC 19.20.010(A)

---

[52] *See Prop. Owners Ass'n of the Highland Subdivision v. City of Ketchikan*, 781 P.2d 567, 571-72 (Alaska 1989) (holding that a city council's decision was legislative because it "affected a large development and a group of similarly situated taxpayers").

and section 9.02(a) of the Charter. But these two provisions do not require the Assembly to engage in a lot-by-lot inquiry.

Most importantly, increase in fair market value is not the only relevant measure of benefit. "[S]pecial benefits cannot always be translated into dollar terms";[53] they can "take various forms," including "a relief from a burden, the creation of a special adaptability in the land, or an improvement which allows the land to continue being used."[54] Furthermore, when conducting proportionality inquiries in similar cases, we have consistently held that "benefit to property is not limited to the immediate increase in property value to the landowner."[55] For example, in *Weber v. Kenai Peninsula Borough*, we affirmed a gas line assessment even though the property owner offered evidence that the value of his property had declined and argued that he did not want to access the line.[56] In *City of Wasilla v. Wilsonoff*, we recognized the benefit of a water main installation, even though the landowner testified that it would be very difficult to hoist a fire hose from the water main to her house and that her insurance rates were unlikely to decrease for many years.[57] Similarly, in *Kissane v. City of Anchorage*, the

---

[53] MCQUILLIN, *supra* note 20, § 38:37, at 188.

[54] *Id.* § 38:38, at 202-04; *see Miller*, 54 P.3d at 291 (approving finding that property benefited from construction of a paved road because, among other things, the road provided "reduced vehicle wear and tear and health benefits from reduced dust").

[55] *Miller*, 54 P.3d at 290; *see also Weber v. Kenai Peninsula Borough*, 990 P.2d 611, 615-16 (Alaska 1999); *City of Wasilla v. Wilsonoff*, 698 P.2d 656, 657-58 (Alaska 1985).

[56] 990 P.2d at 615-16.

[57] 698 P.2d at 658.

territorial court held that a landowner could be assessed for the costs of public parking, even though his property was used for residential purposes.[58]

Here, the special assessments provided the district properties with road access and basic utilities, necessary steps for residential development.[59] We therefore cannot conclude that the discrepancy between the special assessments and increase in appraised property value for some district properties shows gross disproportionality; nor can we conclude that the Assembly acted fraudulently or arbitrarily in determining the assessment amounts.

## V.    CONCLUSION

We AFFIRM the judgment of the superior court affirming the Assembly's special assessment determinations.

---

[58]     159 F. Supp. 733, 738 (D. Alaska 1958).

[59]     This is so notwithstanding the Property Owners' assertion that "the subdivision improvements did not include gas, electric and other shallow utilities, which would all need to be added if a lot owner wanted to construct a home on the lot."